**In re K.J.**

**Appeal of K.P., Mother.**

Superior Court of Pennsylvania.

Submitted May 16, 2011.
Filed Aug. 12, 2011.

---

Aaron A. Mixon, Philadelphia, for appellant.

Patricia A. Korey, Philadelphia, for appellee.

Fritz K. Haverstick and Michael E. Angelotti, Philadelphia, for participating party.

BEFORE: MUSMANNO, OLSON and OTT, JJ.

OPINION BY MUSMANNO, J.:

K.P. ("Mother") appeals from the Order that changed the placement goal for her thirteen-year-old daughter, K.J. ("Child"), from reunification to permanent legal custodianship and granted permanent legal custodianship to L.S. ("Maternal Cousin") and her husband, T.S. We affirm.

At the permanency/goal change hearing (hereinafter, "the evidentiary hearing"), it was revealed that the Philadelphia Department of Human Services ("DHS") became involved with the family in October 2008 through a General Protective Services ("GPS") report alleging that Mother was not supervising Child and her siblings because Mother was using drugs and disappearing for days at a time.[1] N.T., 10/13/10, at 15. DHS substantiated the GPS report and implemented in-home protective services in Mother's home. *Id.*

In April 2009, DHS received another GPS report that Mother had been absent for several days, her whereabouts were unknown to the children, and the children were "fending for themselves at home." *Id.* at 16. On April 3, 2009, after having received continuing allegations of Mother's inadequate supervision and drug use, DHS obtained an Order of Protective Custody for Child and her brother, T.F.,[2] and placed them in kinship care with a maternal aunt ("Maternal Aunt"). *Id.* at 15, 16, 17. Subsequently, the trial court adjudicated Child dependent and committed her to DHS's legal custody. DHS established Family Service Plan ("FSP") goals for

---

1. We note that Child's father is deceased.

2. T.F. is not a subject of this litigation.

Mother after Child entered placement. Mother's parental goals included that she complete drug and alcohol treatment; attend parenting classes; visit with Child; and comply with her mental health treatment plan. *Id.* at 16–20.

Mother's initial drug screen from the trial court's Clinical Evaluation Unit ("the CEU") tested positive for cocaine. *Id.* at 16, 17, 21. The CEU recommended a short-term inpatient program, but Mother refused treatment. *Id.* at 17. When DHS requested additional drug screenings, Mother refused to cooperate. *Id.* at 21, 24. Finally, the CEU referred Mother to an intensive outpatient treatment program that she refused to attend. *Id.* at 21. Mother told DHS that she had previously participated in such a program, but DHS was unable to verify her participation because she had refused to sign the necessary release forms. *Id.* at 22, 26. Mother, however, did complete six sessions of an intensive case management service program in Dauphin County, where she received bi-weekly counseling, food, clothing, and other assistance. *Id.* at 23.

Despite Mother's participation in the Dauphin County program, DHS social worker Timothy Joyce ("Joyce") testified that she had not completed her FSP drug and alcohol treatment objective to DHS's satisfaction because the Dauphin County program was not equivalent to the programs to which the CEU had referred Mother. *Id.* Further, Mother failed to comply with her FSP goals regarding mental health treatment and parenting classes. *Id.* at 17, 20.

While Child was residing in the home of Maternal Aunt, DHS had offered Mother supervised visits with Child in the home. *Id.* at 17–18. Joyce explained, "[Mother] could come and go as she wanted." *Id.* at 18. Mother visited with Child there until DHS placed Child and her siblings in fos-ter care, after Maternal Aunt had stated that she could no longer care for them. *Id.*

Beginning in June 2009, DHS offered Mother bi-weekly supervised visits at the agency, but Mother failed to comply with the visitation plan. *Id.* at 18–19. Regarding this visitation plan, Mother had told Joyce that she "wasn't going to visit her kids at an agency." *Id.* at 20. Mother missed every visit but one. *Id.* at 19.

In July 2009, the trial court ordered DHS to institute an Interstate Compact on the Placement of Children Priority Home Study Request ("the Request") regarding Child's Maternal Cousin, who lives in North Carolina and in whose home Child had spent a substantial amount of time. Order for Priority Home Study Request, 7/17/09, Appendix B. While the Request was pending, Child participated in holiday visits with Maternal Cousin and her family in November and December 2009. Post–Adjudication Hearing Order, 11/20/09, Appendix C. The Request was eventually approved and Child moved to North Carolina in April 2010. N.T., 10/13/10, at 34. Mother visited Child on only one occasion in Philadelphia, on the day before Child moved to North Carolina. *Id.* at 19. In May 2010, Maternal Cousin and Child traveled to Philadelphia to see Mother for Child's birthday. *Id.* at 24. Child came to Philadelphia again that same summer but Mother only visited with her for "a couple of hours ... even though [Child was] there the whole weekend." *Id.* at 24–25. Between June 2009 and October 2010, Mother saw Child only three times.

According to DHS, it "[w]ould have made some accommodation for [Mother]" if she had expressed a desire to visit Child in North Carolina. *Id.* at 27. Also, even though DHS had provided Mother with contact information for both the agency caseworker and the DHS social worker,

she failed to make even one call regarding Child for the duration of the case. *Id.* at 20, 27.

Mother had lived at several addresses throughout Child's placement, and Joyce was aware of two different addresses in Harrisburg alone. *Id.* at 25. At the time of the evidentiary hearing, Joyce was unaware if Mother had stable housing. He testified, "[I]t's [Mother's] pattern, you know, she moves around constantly. It's been the pattern throughout the entire kids' lives, that they would move; move many times." *Id.*

Joyce opined that Mother's pattern of instability and drug use is significant as it relates to Child's best interest. Joyce testified that

> [Mother] has a pattern[,] a history that goes back a good … 20 years—of becoming clean for a while and then going back on drugs, and … [Child's brother] was back and forth with his father. [Child] was back and forth with [Maternal Cousin] twice, and [Child] had moved to four different states, and there have been approximately 10 different schools throughout their growing up years. So there's been a really long [period] of instability, and its significant for the kids to be able to thrive in that kind of environment where there's constant-moving around.

*Id.* at 26.

Joyce testified that it is in Child's best interest to grant permanent legal custody to Maternal Cousin. *Id.* Child attends middle school in Maternal Cousin's neighborhood, where she is excelling in her classes and receiving A's. *Id.* at 11, 34. Child also receives regular visits from a child services agency caseworker in Maternal Cousin's area. *Id.* at 12–13. According to Joyce, there are no issues or concerns in Maternal Cousin's home and Child is "doing extremely well there." *Id.* at 12.

Joyce described Child as being very happy and stated that she "receives the support that she needs." *Id.* at 24. Joyce views Maternal Cousin's home as a stable environment. *Id.* at 26–27. He reported that Child is safe in the home and that all of her daily needs are met. *Id.* at 13.

Maternal Cousin testified via telephone that things are going "great with Child." *Id.* at 34. Maternal Cousin stated that she is willing to accept permanent legal custody of Child and to continue providing care for her until she reaches the age of eighteen. *Id.*

DHS filed a Petition for permanent legal custody in August 2010. The trial court scheduled a hearing for August 31, 2010. Child and Maternal Cousin flew from North Carolina to Pennsylvania to attend this hearing, at which Mother was also present. Although DHS was prepared to proceed with the hearing as scheduled, the hearing was postponed because Mother's attorney was unavailable and Mother had decided to contest permanent legal custody. *Id.* at 7, 9. The next available date for a placement hearing was October 13, 2010. The trial court granted permission for Child and Maternal Cousin to testify via telephone on that date. *Id.* at 7–8. At the August 2010 hearing, Mother acknowledged her receipt of DHS's Petition for permanent legal custody and signed a subpoena for the October 13, 2010 court date. *Id.* at 5.

When court convened on October 13, 2010, Mother's counsel requested a continuance, stating that he had received a phone call from Mother the previous evening in which she asserted that she had been rushed to a hospital near her residence in the Harrisburg area due to lung and thyroid problems. *Id.* Mother's counsel admitted that he could not present proof of Mother's alleged hospitalization.

*Id.* at 6. The trial court denied the continuance request and conducted the evidentiary hearing in Mother's absence. *Id.* at 10. At the close of the evidentiary hearing, the trial court entered an Order granting permanent legal custody of Child to Maternal Cousin and her husband. Mother timely appealed from this Order.

Mother raises the following questions for our review:

A. Whether the trial court committed reversible error when it granted Permanent Legal Custody of [Child] to a guardian chosen by DHS, because such a determination was not supported by clear and convincing evidence to be in the best interest of [Child?]

B. Whether the trial court committed reversible error when it did not grant [Mother's] counsel's request for a continuance and held the [evidentiary] hearing without [Mother being] present or available to testify due to illness[?] Such a denial was highly prejudicial toward [Mother] and violated her right to due process.

Mother's Brief at 2.

▇▇▇ Our standard of review of an order granting permanent legal custody is abuse of discretion.

When reviewing such a decision[,] we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interest and not those of his or her parents.

At each review hearing concerning a child who has been adjudicated dependent and removed from the parental home, the trial court must consider: the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

These statutory mandates clearly place the trial court's focus on the best interests of the child.

In addition[, a]lthough bound by the facts as found by the trial court and supported by the record, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for an abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and the witnesses.

*In re A.K.,* 906 A.2d 596, 599 (Pa.Super.2006) (citations and brackets omitted).

▇▇▇ Section 6351(f) of the Juvenile Act prescribes the pertinent inquiries for the reviewing court as follows:

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

\* \* \*

42 Pa.C.S.A. § 6351(f). Once the court makes these findings, it must determine whether reunification, adoption, or placing the child with a legal guardian is best suited to the child's safety, protection, and physical, mental and moral welfare. *In re B.S.*, 861 A.2d 974, 976–77 (Pa.Super.2004). If the court decides that neither reunification, adoption, or placement with a legal guardian is appropriate, the court may place the child with a fit and willing relative. 42 Pa.C.S.A. § 6351(F.1)(4); *see also In re B.S.*, 861 A.2d at 977.

■ Mother asserts that the trial court erred in awarding permanent legal custody to Maternal Cousin because Mother had (1) complied with her FSP goals in that she had visited regularly with Child when Child was in placement with Maternal Aunt, and (2) completed the Dauphin County case management program. Mother's Brief at 5.

The evidence supports Mother's claims that she had visited Child regularly while Child lived with Maternal Aunt, but Mother's regular visits with Child ended at the conclusion of that placement. Joyce testified that when Child entered foster care in June 2009, Mother failed to attend the visits DHS offered to Mother at the agency. N.T., 10/13/10, at 18–19. Regarding the issue of Mother's visitation, Mother told Joyce that she "wasn't going to visit her kids at an agency." *Id.* at 20. Mother failed to attend every visit but one. *Id.* at 19.

Mother also failed to take full advantage of her opportunities to see Child when Child had returned to Pennsylvania in May 2010 with Maternal Cousin. Child again traveled to Pennsylvania that same summer, but Mother visited with her for only "a couple of hours ... even though [Child was] there the whole weekend." *Id.* at 24–25. Between June 2009 and October 2010, Mother saw Child only three times despite the fact that DHS "[w]ould have made some accommodation for her" if Mother had expressed a desire to visit Child in North Carolina. *Id.* at 27. In addition, even though DHS had provided Mother with contact information for both the North Carolina caseworker assigned to Child's case and the DHS social worker, Mother failed to make even one call regarding Child for the duration of the case. *Id.* at 20, 27.

Mother also failed to comply with her FSP goals regarding mental health treatment and parenting classes. *Id.* at 17, 20. Moreover, although the record supports Mother's assertion that she had participated in the Dauphin County case management program, DHS stated that such participation did not fulfill Mother's drug and alcohol treatment FSP goal because the Dauphin County program was not equivalent to the programs to which the CEU had referred Mother. *Id.* at 23.

Based upon the foregoing, we discern no abuse of discretion by the trial court in determining that it would be in Child's best interest to award permanent legal custody of Child to Maternal Cousin. *See* Trial Court Opinion, 1/18/11, at 12 (stating

that "[g]iven Mother's absence from her daughter's life and [Child's] dire need for permanency, . . . a goal change to [permanent legal custody] was clearly best suited to [Child's] need for safety, protection, and physical, mental, and moral welfare. Mother will continue to have court-ordered visitation with [Child.]"); *see also In re B.S., supra.* Mother's first issue does not entitle her to relief.

■ In her second issue, Mother argues that the trial court erred and violated her right to due process by denying her counsel's request for a continuance of the evidentiary hearing based upon Mother's alleged illness. *See* Mother's Brief at 7–9. Mother asserts that "[b]ecause of what was at stake in the hearing, it should have been briefly continued to enable [M]other's participation in the hearing." *Id.* at 9.

This Court has noted that "a trial court has broad discretion regarding whether a request for continuance should be granted, [and] we will not disturb its decision absent an apparent abuse of that discretion." *In re: J.K.,* 825 A.2d 1277, 1280 (Pa.Super.2003). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result[ ] of partiality, prejudice, bias, or illwill." *Id.* (citation omitted).

The trial court addressed Mother's instant claim in its Opinion as follows:

In denying Mother's counsel's request for a continuance, the trial court considered that a continuance had previously been granted, that [Child] and [her] caregiver[, *i.e.,* Maternal Cousin,] had traveled from North Carolina to attend the previous hearing, that Mother had notice of the [evidentiary] hearing, that Mother was represented through competent counsel, that [Child] may be ad-

versely affected [FN] by a continuance, and that it was in [Child's] best interest to receive permanency. [Child] had been in placement [for] eighteen months, had lived in four states, had been in approximately ten different schools, and greatly deserved the permanency that [the Adoption and Safe Families Act, 42 U.S.C. §§ 671–675,] mandates. Additionally, while Mother represented to her counsel that she was hospitalized on October 12, 2010[,] in another city, she did not present any documentation of her hospitalization. She failed to provide information that she remained hospitalized or otherwise [was] unable to participate in the [evidentiary] hearing on October 13, 2010[.] Most tellingly, however, her counsel rejected the opportunity to allow for her future participation.

---

[FN] The Child Advocate objected to a continuance. According to the Child Advocate, the [evidentiary] hearing was the "second time that [Child] has been taken out of school. Each time she comes around to court, she has a hard time, it's really traumatic for her, and she really just wants this to be over with."

The trial court considered bifurcating the case to allow for Mother's testimony. However, Mother's counsel indicated that returning to court so that Mother could testify "[m]ay be an exercise in futility." He indicated that Mother would need to review the notes of testimony with him, that he did not see that transpiring, and that "I don't think it's going to change much." The trial court determined that based on those representations, it was unnecessary to bifurcate the [evidentiary] hearing for additional testimony. In his closing argument, Mother's Counsel then argued that the testimony was unrefuted because he did not have the opportunity to [present the testimony

of] his client [and that Mother would have liked to testify]. Mother cannot have it both ways. While Mother objected to the court's continuance, her counsel did not raise any due process issues, nor did he take advantage of the opportunity to bifurcate the [evidentiary] hearing so that Mother could testify. After hearing the testimony, Mother's counsel stated that to return to court for another hearing may "not change much." [Further, counsel] explicitly stated that "the Court should just go ahead and render this decision today." As she failed to raise and preserve the due process issue before the trial court, Mother waived this issue. *See In re: J.Y.*, 754 A.2d [5, 11 (Pa.Super.2000) (holding that the appellants/parents had waived their due process challenge by failing to raise and preserve this claim before the trial court) ].

Trial Court Opinion, 1/18/11, at 13–14 (citations to record and brackets omitted, footnote in original).

The trial court's denial of a continuance was based upon (1) Mother's unsubstantiated, last-minute claim of illness,[3] (2) Mother's counsel's representations that a continuance would be "an exercise in futility" that was not "going to change much[,]" and (3) Mother's counsel's refusal of the trial court's offer to bifurcate the evidentiary hearing. We find that the trial court's offer to bifurcate the hearing was a reasonable response to Mother's absence on the day of the hearing. Bifurcation would have avoided inconvenience to the other parties while affording Mother the opportunity to testify. After review, we discern no partiality, unreasonableness, bias, or ill-will on the part of the trial court in its decision to conduct the evidentiary hearing in Mother's absence, and we adopt

the foregoing analysis by the trial court for the purpose of this appeal. *See* Trial Court Opinion, 1/18/11, at 13–14.

Based upon the foregoing, we affirm the trial court's Order that changed the placement goal to permanent legal custodianship and granted permanent legal custody of Child to Maternal Cousin and her husband.

Order affirmed.

---

**3.** We note that Mother did not present proof of her alleged hospitalization on appeal.