J-S39042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: N.S., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
APPEAL OF: M.L., NATURAL MOTHER : No. 275 WDA 2017

Appeal from the Order Entered January 24, 2017
In the Court of Common Pleas of Bedford County
Orphans' Court at No(s): DP-42 for 2016

BEFORE: BENDER, P.J.E., BOWES, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.: **FILED AUGUST 01, 2017**

M.L. (Mother) appeals from the order entered January 24, 2017, in the Court of Common Pleas of Bedford County, which ended the dependency of N.S. (Child), a male born in March 2001, and placed him in the legal and physical custody of his paternal grandmother, B.C. (Paternal Grandmother). We affirm.

On August 5, 2016, Bedford County Children and Youth Services (CYS) filed an application for emergency protective custody of Child. In its application, CYS averred that a casework supervisor visited Child's home on August 4, 2016, "due to family conflict" regarding Mother and her husband, Child's stepfather (Stepfather).[1] Application for Emergency Protective Custody, 8/5/2016, at 3. Specifically, Mother filed a Protection From Abuse

---

[1] Child's biological father is deceased.

---

* Retired Senior Judge assigned to the Superior Court.

(PFA) action against Stepfather "due to an incident in which [Stepfather] assaulted her causing injury to her face." *Id.* at 4. Mother later dropped the PFA action, and Stepfather returned to the family home. *Id.* CYS averred that Child left the family home during the evening of August 4, 2016, after "[i]t was decided … that it would be in the family's best interest if the child went to stay with the grandparents." *Id.* at 3. The trial court granted the application for emergency protective custody, and placed Child in the care of his maternal grandparents, V.S. and J.S. (Maternal Grandparents). Child remained in the care of Maternal Grandparents pursuant to a shelter care order entered August 10, 2016, and the court adjudicated Child dependent by order entered August 22, 2016.

The trial court conducted a permanency review hearing on January 10, 2017. At the start of the hearing, the Court explained that it would be addressing Child's dependency, as well as "various custody petitions" that had been filed. N.T., 1/10/2017, at 3. The court explained that those petitions included "No. 1218 for '12, which is [Stepfather] versus [Mother], No. 1479 for '12, which is [D.S.], [S.J.] versus [Mother and Stepfather]. And No. 669 for 2016, which is [Child's maternal grandmother, V.S.] versus [Mother]."[2] *Id.* at 3.

_____

[2] This Court received only the dependency record in this case. As a result, we are not privy to any custody filings that may have occurred. In addition, our review of the record does not reveal who D.S. and S.J. are, and the

*(Footnote Continued Next Page)*

The trial court then heard testimony from Derik Comperatore, a licensed social worker tasked with providing counseling to Child and Mother. Mr. Comperatore testified that he participated in seven individual counseling sessions with Mother, and thirteen individual counseling sessions with Child. *Id.* at 13. Mr. Comperatore testified that Child and Mother participated in only one counseling session together. *Id.* at 8. Mr. Comperatore explained that Child and Mother display a great deal of resentment toward each other, and that "they both seem wary of getting back into the same house together." *Id.* at 9. Nonetheless, Mr. Comperatore reported that their session went better than expected, in the sense that both Child and Mother "were almost in agreement that they didn't want to maintain contact." *Id.* at 15. Mr. Comperatore continued, "when I refer to better than expected, I was impressed that both sides were able to not escalate to the point where we needed to end the session." *Id.* at 22. Ultimately, Mr. Comperatore opined that Child and Mother likely will not be able to reconcile their differences and "liv[e] peacefully under the same roof" before Child turns eighteen. *Id.* at 11.

Next, the trial court requested a report from Child's guardian *ad litem*, Carol Ann Rose, Esquire. Attorney Rose reported that Child does not believe that his relationship with Mother can be fixed, and that Child wants to live

*(Footnote Continued)* ───────────

amended caption for the transcript of the hearing indicates that "No. 669 of 2016" is actually a PFA action.

with Paternal Grandmother in Arizona. *Id.* at 28. Attorney Rose explained, "[h]e did have a visit over the Christmas holiday. It went extremely well. And he had spent some time [there] in the past[.]" *Id.* at 26. Attorney Rose expressed support for Child's position, explaining that Child is mature for his age, that he does well in school, and that his relationship with Mother is a source of stress. *Id.* at 27-28. Attorney Rose reported that Child appears to be less stressed now that he no longer lives with Mother, and that "his personality has changed dramatically. The first time I met him, he never smiled. … The conversation I had with him today, he was laughing. Telling me about his holiday in Arizona." *Id.* at 26-28. Attorney Rose noted that Child continues to experience stress resulting from his relationship with Mother, because Child lives with his Maternal Grandparents, who reside adjacent to Mother "on the same yard." *Id.* at 26.

The trial court then heard testimony from Mother. Mother acknowledged that she and Child do not get along, and that they cannot live together currently. *Id.* at 31. However, Mother opposed Child's proposed move to Arizona, as it would limit her ability to engage in counseling with Child and improve their relationship in the future. *Id.* Mother explained, "as of right now, no. We cannot live under the same roof … but you have to get in a room together to resolve anything …. If [Child is] in Arizona, there is no hope[] of anything." *Id.*

Mother also questioned the care being provided to Child by his Maternal Grandparents. Specifically, Mother testified that Child is gay, and

that the Maternal Grandparents do not accept his sexual orientation. *Id.* at 34. Mother reported that Child's maternal grandmother, V.S., "gave him a list of Bible vers[e]s, from what I understand, about being stoned to death for being gay." *Id.* at 33. In addition, V.S. stated to Child, "'you're not going to heaven because you're gay. You're going to Hell.'" *Id.*

The trial court next heard a brief statement from V.S.'s attorney, Deanna McCoy, Esquire. Attorney McCoy stated, "[h]er position is that she loves her grandson a great deal, but she also believes it's in his best interest to go spend time living with the grandparents in Arizona." *Id.* at 47. Attorney McCoy emphasized the stress that Child experiences as a result of continuing to live so close to Mother, due to the hostility between her and V.S. *Id.*

Finally, the trial court heard a statement from Paternal Grandmother, who participated via telephone. Paternal Grandmother asked that Child be permitted to live with her. *Id.* at 49. Paternal Grandmother explained that it would be good for Child to "get a new start" away from Mother in Arizona. *Id.* Paternal Grandmother stressed that she had no intention of separating Child from Mother, and that "the [maternal] grandparents are welcome to come, anybody is welcome to come visit. And we will get him back to Pennsylvania whenever necessary." *Id.*

At the conclusion of the hearing, the trial court announced that it would terminate Child's dependency and award legal and physical custody of Child to Paternal Grandmother. *Id.* at 55. In support of this decision, the

court conducted an analysis of the sixteen best interest factors set forth at Section 5328(a) of the Child Custody Act, 23 Pa.C.S. § 5328(a). *Id.* at 50-55. Following the hearing, on January 24, 2017, the court entered the order complained of on appeal, in which it found that Child was no longer dependent, as he had been placed in the care of a fit and willing relative. Mother timely filed a notice of appeal on February 6, 2017, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

A. Whether the Court erred and abused its discretion by terminating court proceedings and awarding custody to an out of state [P]aternal [G]randmother when the goal of the proceedings was to return the child to the parent?

B. Whether the Court erred and abused its discretion by terminating court proceedings and awarding custody to [P]aternal [G]randmother rather than allow the parent and child to engage in further reunification efforts, as there had been only one parent-child joint counseling session scheduled by [CYS]?

C. Whether the Court erred and abused its discretion by determining [P]aternal [G]randmother was fit for caring for the child, as insufficient evidence regarding her home environment and care of the child was presented at the hearing; thus, the record does not support the court's decision?

Mother's Brief at 4 (trial court answers omitted).

We review the trial court's order pursuant to an abuse of discretion standard of review. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). As such, we must accept the court's findings of fact and credibility determinations if they are supported by the record, but we need not accept the court's inferences or conclusions of law. *Id.*

Pursuant to Section 6351(f) of the Juvenile Act, trial courts must make a series of factual determinations at each permanency review hearing for a dependent child. *See* 42 Pa.C.S. § 6351(f). These determinations include, among other things, the continuing necessity and appropriateness of the child's placement; the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child; the likely date by which the placement goal for the child might be achieved; whether reasonable efforts were made to finalize the permanency plan in effect; and whether the child is safe. *Id.* Once a court makes the requisite determinations pursuant to Section 6351(f), the court must also determine the most appropriate placement for the child pursuant to Section 6351(f.1). *See* 42 Pa.C.S. § 6351(f.1). The court must then "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(g).

This Court has explained the placement alternatives available to trial courts pursuant to Section 6351(f.1) as follows.

> Section 6351(f.1) of the Juvenile Act lists the alternatives available to the juvenile court for the permanent placement of a depend[e]nt child. Upon a child's adjudication of dependency, the juvenile court may order reunification with the child's parent, guardian, or custodian. 42 Pa.C.S.[] § 6351(f.1)(1). If reunification with the child's parent, guardian, or custodian is not best suited to the child's safety, protection and physical, mental and moral welfare, the court may terminate parental rights and place the child for adoption. 42 Pa.C.S.[] § 6351(f.1)(2). If the court decides that neither reunification nor adoption is best

suited to the child's safety, protection and physical, mental and moral welfare, it may order the child to be placed with a legal custodian. 42 Pa.C.S.[] § 6351(f.1)(3). If the court decides that neither reunification, adoption, nor placement with a legal custodian are best suited to the child's safety, protection and physical, mental and moral welfare, the court can place the child with a fit and willing relative. 42 Pa.C.S.[] § 6351(f.1)(4). Finally, the court may place the depend[e]nt child in another permanent living arrangement if DHS presents a compelling reason that any of the previous options are not suited best to the child's safety, protection and physical, mental and moral welfare. 42 Pa.C.S.[] § 6351(f.1)(5).

*In re B.S.*, 861 A.2d 974, 976-77 (Pa. Super. 2004).

In addition, the Pennsylvania Rules of Juvenile Court Procedure provide the following guidance on when a trial court may end supervision of a dependent child.

**A. Concluding Supervision.** Any party, or the court on its own motion, may move for the termination of supervision when court-ordered services from the county agency are no longer needed and:

(1) the child has remained with the guardian and the circumstances which necessitated the dependency adjudication have been alleviated;

(2) the child has been reunified with the guardian and the circumstances which necessitated the dependency adjudication and placement have been alleviated;

(3) the child has been placed with a ready, willing, and able parent who was not previously identified by the county agency;

(4) the child has been adopted and services from the county agency are no longer needed;

- 8 -

(5) the child has been placed in the custody of a permanent legal custodian and services from the county agency are no longer needed;

(6) the child has been placed in the physical and legal custody of a fit and willing relative and services from the county agency are no longer needed;

\*\*\*

**C. Objection.** Any party may object to a motion under paragraph (A) and request a hearing.

**D. Hearing.** If objections have been made under paragraph (C), the court shall hold a hearing and give each party an opportunity to be heard before the court enters its final order.

\*\*\*

**F. Cessation of services.** When all of the above listed requirements have been met, the court may discharge the child from its supervision and close the case.

Pa.R.J.C.P. 1631.

In her first issue, Mother argues that placing Child in the custody of Paternal Grandmother was contrary to Child's permanency goal of reunification. Mother's Brief at 7-8. Mother argues that the trial court violated the well-settled public policy that courts should strive to preserve families whenever possible, and that children should be placed in the custody of parents rather than third parties. *Id.*

At the outset, Mother misunderstands that the order placing Child in the custody of Paternal Grandmother was, in effect, an order changing Child's permanency goal. *See, e.g., In re K.J.,* 27 A.3d 236, 244 (Pa. Super. 2011) (affirming the trial court's order that "changed the placement

goal to permanent legal custodianship and granted permanent legal custody of Child to Maternal Cousin and her husband"). Because the trial court in this case changed Child's permanency goal to placement with a fit and willing relative, the court was no longer bound by Child's previous permanency goal of reunification.

Moreover, while Mother is correct that courts should strive to preserve families whenever possible, courts need not persist in attempting to reunite a family when further reunification efforts would be futile and/or contrary to a child's best interest. In this case, the record establishes that Child does not want to be reunited with Mother, and that he is not likely to be reunited with Mother before he turns eighteen. N.T., 1/10/2017, at 11, 28. The record further establishes that it would be detrimental to Child to remain with his Maternal Grandparents, due to their close proximity to Mother, and due to their hostility toward his sexual orientation. *Id.* at 26, 33, 47. Paternal Grandmother was the best option available to Child, and it was within the court's discretion to place Child in her care now, rather than delay permanency unnecessarily. Mother's first issue fails.

In her second issue, Mother argues that the trial court abused its discretion by placing Child in the custody of Paternal Grandmother when she had not yet received reasonable reunification services. Mother's Brief at 9-11. Mother argues that she received only one counseling session with Child, and that the session went better than expected. *Id.* at 9. Mother argues that it was improper to end the counseling sessions, because "there were

clear indicators that future sessions would have been eventually successful." *Id.* at 10.

As discussed above, the record belies Mother's claim that further counseling sessions would eventually succeed in reuniting her with Child. While Mr. Comperatore testified that his first counseling session with Child and Mother went better than expected, he explained that the session went better than expected only in the sense that Child and Mother agreed that they should not have contact, and that they did "not escalate to the point where we needed to end the session." N.T., 1/10/2017, at 15, 22. Indeed, he offered the opinion that reunification was not likely to occur before Child turns eighteen. *Id.* at 11. Because the record confirms that further attempts at reunification with Mother would be futile, we discern no abuse of discretion.

In her third issue, Mother argues that the record does not support the trial court's conclusion that Paternal Grandmother is an appropriate caretaker for Child, because the court heard little, if any, evidence concerning Paternal Grandmother's "care of the child, her home environment, or whether or not there would be counseling offered for the child in Arizona." Mother's Brief at 11-12.

We conclude that the record was sufficient to support the trial court's decision. During the January 10, 2017 permanency review hearing, Attorney Rose reported that Child visited with Paternal Grandmother over the Christmas holiday, and that the visit went extremely well. N.T.,

1/10/2017, at 26. The court also heard from Paternal Grandmother directly, who provided a statement expressing her desire to care for Child and to ensure that Child is able to maintain a relationship with the rest of his family. *Id.* at 49. Mother made no effort to challenge Paternal Grandmother's fitness as a caregiver during the hearing, and everyone other than Mother, including counsel for CYS, either had no objection to Child's move to Arizona or supported it. Mother is not entitled to relief.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by ending Child's dependency and by placing Child in the custody of Paternal Grandmother. Accordingly, we affirm the court's January 24, 2017 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2017

- 12 -