J-A02041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.Z., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1361 MDA 2023 |

Appeal from the Order Entered September 19, 2023
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000141-2022

BEFORE: NICHOLS, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J: **FILED: MARCH 20, 2024**

R.Z. ("Mother") appeals from the order changing the primary permanency goal of her daughter, A.M. ("Child"), born in January 2018, from reunification to adoption.[1] We affirm.

We glean the relevant facts and procedural history of this matter from the certified record. The York County Office of Children, Youth & Families ("CYF") has an extensive history with Mother.[2] In April 2022, CYF received a general protective services report alleging that Mother was abusing illegal substances. *See* N.T., 6/20/22, at 6-7; *see also* Order of Adjudication,

---

[1] According to the certified record, Child's father is deceased.

[2] The record indicates that Mother consented to the termination of her parental rights with respect to another child during the pendency of the instant case. *See* N.T., 5/18/23, at 56.

6/30/22, at 1. On the same date, Mother tested positive for amphetamines, cocaine, and marijuana. **See** Order of Adjudication, 6/30/22, at 1. As a result, CYF implemented a safety plan in the home which mandated that Child's maternal grandmother was to supervise all contact between Child and Mother. **See id**. at 1-2. In June 2022, after learning that Mother had violated the safety plan by having unsupervised contact with Child, CYF obtained emergency protective custody of Child, who was then placed with a foster family.[3] Following a shelter care hearing, the court continued Child's placement. Thereafter, the court adjudicated Child dependent on June 30, 2022.

In furtherance of Child's initial permanency goal of reunification, the court ordered Mother to submit to drug screens, attend visitation with Child, undergo a drug and alcohol evaluation and follow any resulting recommendations, participate in mental health therapy, engage in domestic violence counseling, maintain stable housing and employment, and generally comply with CYF's directives. **See** Order, 5/25/23 at 1; N.T., 6/30/22, at 5. At review hearings conducted between October 2022 and May 2023, the dependency court determined that Mother had made minimal progress

---

[3] On October 6, 2022, Child was placed in a new foster home with E.B. ("Foster Mother") and E.B.'s husband, B.B., where Child has remained throughout these proceedings. Despite some behavioral difficulties from Child, which Foster Mother has engaged services to address, Foster Mother reports that Child is doing well. **See** N.T., 9/18/2023, at 46-47.

towards alleviating the circumstances that brought Child into CYF's care and custody. *See* Order, 12/1/22, at 1-2; Order, 5/25/23, at 1-2. Mother never progressed beyond supervised visitation. Further, although she claimed to be qualified for a medical marijuana card, Mother never obtained one, and her drug screens were consistently positive for marijuana and alcohol. *See* N.T., 6/20/22, at 17; *see also*, N.T., 9/18/23, at 52-53. Mother obtained housing with her current paramour, but CYF determined that her living situation was inappropriate because her paramour had previously been convicted of crimes involving children, specifically, corruption of minors. *See* N.T., 9/18/23, at 34, 37. Additionally, Mother had been in an abusive relationship with a former boyfriend, with whom she continued to engage after Child was removed from her care. *See* N.T., 3/14/23, at 11; *see also* Order, 10/6/22, at 2.[4] The court, in its May 2023 review order, cautioned Mother that while the primary goal was reunification, the court could change the goal to "a more appropriate goal" if she did not make substantial progress or make reunification imminent. Order 5/25/23, at 3.

On September 18, 2023, the parties appeared for a hearing before a juvenile court hearing officer ("hearing officer"). CYF requested a change in

---

[4] During one visit, Mother's former boyfriend pulled a weapon on a bystander outside of the visitation center. *See* Order, 10/6/22, at 2.

Child's permanency goal from reunification to adoption.[5] Mother, who left during the hearing to attend her first domestic violence counseling session, was represented by counsel. Child, who was five years old at the time of the hearing, was represented by a guardian *ad litem*. Although Mother did not testify, she presented testimony from D.H., Child's maternal grandmother. At the conclusion of the hearing, the hearing officer docketed a proposed order with her findings and recommendation, which included a goal change to adoption with a concurrent goal of permanent legal custodianship with a relative.[6]

The dependency court, in the order entered September 19, 2023, adopted the hearing officer's proposed order and changed Child's goals to

_____

[5] The parties agreed to the hearing before the hearing officer. **See** N.T., 9/18/23, at 3-4. CYF first discussed a possible goal change to adoption in the middle of the hearing during testimony from a caseworker. **See id**. at 56. CYF's counsel then argued in favor of a goal change. **See id**. at 69.

[6] We are mindful that Pa.R.J.C.P. 1187(A)(1)(c) limits the authority of a hearing officer to preside over any hearing in which any party seeks to change the goal to adoption and, therefore, calls into question the appropriateness of the procedures leading to the dependency court's order for a goal change to adoption. However, Mother did not object on this basis, nor has she discussed Rule 1187(A)(1)(c) in her appellant's brief. Given our Supreme Court's disapproval of an appellate court's raising of an issue *sua sponte*, we highlight Rule 1187(A)(1)(c) for the benefit of the court and the hearing officer in future proceedings, but we will not address the rule as a basis for relief in this appeal. **See Gibraltar Rock, Inc. v. Department of Environmental Protection**, 286 A.3d 713, 723-24 (Pa. 2022) (noting that "where the parties fail to preserve an issue for appeal, [an appellate court] may not address the issue, even if the disposition of the trial court was fundamentally wrong") (internal citation and quotation omitted).

adoption with a concurrent goal of permanent legal custodianship with a relative. Mother timely filed a notice of appeal[7] and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed a statement pursuant to Rule 1925(a), referring this Court to the findings set forth in its September 19, 2023 order.

On appeal, Mother presents two issues for our review:

1. Whether the juvenile court erred as a matter of law and/or abused its discretion by changing the court ordered goal despite the testimony of progress made by Mother?

2. Whether the juvenile court erred as a matter of law and/or abused its discretion when it changed the court ordered goal from reunification to adoption without clear and convincing evidence that a change of goal would serve the best interests of . . . Child?

Mother's Brief at 4 (some capitalization omitted).

It is well settled that the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, governs the placement and custody of a dependent child. *See In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). This Court reviews an order regarding a dependent child's placement goal pursuant to an abuse of discretion

---

[7] Mother stated she was appealing from the order dated September 18, 2023, presumably referring to the date of the hearing officer's initial findings and recommendations, which the court subsequently adopted in an order entered September 19, 2023. We note that the hearing officer's proposed order was interlocutory until it was confirmed by the court. *See In re C.V.*, 882 A.2d 481, 488 (Pa. Super. 2005). Because the dependency court's September 19, 2023 order confirmed the hearing officer's findings and recommendations, this appeal is properly before this Court. We have amended the caption to reflect that this appeal arises from the court's order entered September 19, 2023.

standard. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019). "In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." *In re N.C.*, 909 A.2d at 822-23 (internal citations and quotations omitted).

Our scope of review is of the broadest possible nature, and this Court will ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. *See In re K.J.*, 27 A.3d 236, 241 (Pa. Super. 2011). This Court affords great deference to the trial court's findings of facts that are supported by the record. *See Interest of H.J.*, 206 A.3d at 25. If the record supports the trial court's findings, this Court will affirm, even if the record could also support an opposite result. *See id*.

When reviewing the trial court's goal change order, we are mindful that the focus of all dependency proceedings, including goal change proceedings, is on the safety, permanency, and well-being of the child and that the best interest of the child must take precedence over all other considerations. *See id*. Pursuant to 42 Pa.C.S.A. § 6351(f), the trial court must consider numerous factors, including the appropriateness and feasibility of the current placement goal for the child at each permanency review hearing. *See* 42 Pa.C.S.A. § 6351(f)(4). If the trial court determines that reunification with a parent is

not in a child's best interest, the court may change the child's goal to adoption. *See* 42 Pa.C.S.A. § 6351(f.1)(2). A goal change to adoption does not terminate parental rights to a child, but "is a step in that direction." *See Interest of H.J.*, 206 A.3d at 25 (internal citation omitted).

This Court recognizes that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting[,]" and that an agency should complete the placement process within eighteen months. *Id*. (internal citation and quotations omitted). Further, an agency must make reasonable efforts to return a child to a biological parent. *See Interest of T.M.W.*, 232 A.3d 937, 947 (Pa. Super. 2020). However, when an agency's reasonable efforts fail, the agency shall redirect its efforts towards placing the child in an adoptive home. *See In re N.C.*, 909 A.2d at 823. Once the trial court sets a goal to adoption, an agency is no longer required to provide services to a parent. *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008).

Although Mother presents two separate claims for relief, she essentially presents a single argument for our consideration, *i.e.*, whether the court abused its discretion or erred legally in weighing the evidence presented at the goal change hearing on September 18, 2023. Mother contends she substantially complied with her court-mandated objectives and is significantly closer to reunification with Child than she was at the start of the case. *See* Mother's Brief at 10-11. Mother submits that she has obtained suitable

housing and employment, completed a drug and alcohol evaluation, and not tested positive for any illegal substances except marijuana since January 2023. *See id*. at 11. Finally, Mother asserts that CYF did not present testimony that changing Child's goal to adoption was in Child's best interest. *See id*. at 14.

The court concluded that changing Child's primary permanency goal to adoption was appropriate due to Mother's lack of progress with respect to her court-mandated goals. *See* Order, 9/19/23, at 3 ("The current placement goal is not appropriate and/or feasible, in that Mother has been making minimal to moderate progress on her court-ordered goals and services"). The court referred to, *inter alia*, Mother's failures to: (1) begin domestic violence counseling in a timely manner; (2) progress in her visitations with Child; (3) secure appropriate housing and employment; and (4) consistently engage with drug and alcohol treatment. *See id*. at 1-2. Based upon this evidence, the court deemed that changing Child's permanency goal would best serve Child's safety, permanency, and well-being.

Our review establishes that the record supports the dependency court's determinations. Primarily, Mother failed to engage in domestic violence counseling until just prior to the goal change hearing. *See* N.T., 9/18/23, at 19 (indicating that Mother completed her initial intake for domestic violence treatment on August 17, 2023). Brittany Sunday ("Ms. Sunday"), a clinical supervisor and family therapist with Catholic Charities, testified that she and

her agency had attempted to enroll Mother in domestic violence counseling since December 2022, but Mother repeatedly cancelled her intake appointments. *See id*. at 19-20.[8]

With respect to visitations, Mother, since October 2022, had one two-hour supervised visit with Child per week . *See* Order, 10/6/22, at 2; *see* N.T., 9/18/23, at 39. In December 2022, the agency supervising visitation had implemented a "double confirmation" policy due to Mother's inconsistent attendance.[9, 10] *See* N.T., 12/1/22, at 11. In May 2023, the court informed Mother that visitation could be expanded to a second visit each week if she did not miss a drug test for four straight weeks and tested negative each time. *See* N.T., 5/25/23, at 37. Mother, however, did not comply. By the time of the September 2023 hearing, Catholic Charities had reduced Mother's visitation to a weekly one-hour visit with Child in case Mother had another unexcused absence and Catholic Charities closed its services. *See* N.T., 9/18/23, at 39. David Kasberg ("Mr. Kasberg"), a family advocate, reported

---

[8] Catholic Charities assisted Mother with obtaining employment, supervising visits, developing a budget, and completing a parenting course. Ms. Sunday also indicated that because Mother missed appointments, Catholic Charities placed Mother on an "appointment contract," meaning that Catholic Charities, would close its services if Mother had one more unexcused absence. *See id*. at 21-22.

[9] The policy required Mother to call-in before the visit to confirm her attendance and for her to arrive early to the visits to ensure her participation.

[10] From August 2022 to December 2022, Mother attended ten of fifteen visits with Child. *See* N.T., 12/1/2022, at 10-11.

that Mother had completed a parenting program and socialized with Child appropriately, but she continued to rely upon the visitation supervisor when Child needed redirection. *See id*. at 33.

Regarding Mother's residence, Mr. Kasberg testified that Mother continued to live with her paramour, who had been charged with corruption of minors. *See id*. at 37. Although Mr. Kasberg deemed Mother's residence to be "environmentally appropriate," he testified, "[I]t's an inappropriate place [for Child]" due to the paramour's criminal history. *See id*. at 34. Mother is employed at Bob Evans, but the certified record also indicates that Mother's job offered her limited hours and was insufficient to financially sustain her. *See id*. at 33-34.

As to Mother's drug and alcohol treatment, Mother has attended counseling for drugs and alcohol since August 2022 and successfully abstained from "potent drugs," such as cocaine. *Id*. at 9. However, Mother has consistently tested positive for marijuana and alcohol, and she has not obtained a medical marijuana card. Tanner Swarr ("Ms. Swarr"), a CYF caseworker, testified that Mother had been tested eight to twelve times per month since the May 2023 hearing, and Mother tested negative only four times, while testing positive twenty-five times, and failing to appear seven times. *See id*. at 52-53. Notably, Mother represented to the court that she would stop using marijuana to get Child back, but she failed to do so even

after the court offered her expanded visitation if she provided clean drug tests. *see* N.T., 5/25/23, at 37, 39-41.

Regarding Child's relationship with Mother, the record is silent as to whether Mother ever involved herself in Child's care beyond weekly supervised visitation. By contrast, Ms. Swarr testified that Child's foster parents are bonded with Child. *See* N.T., 9/18/23, at 59. Foster Mother testified that she desires to be a "long-term resource" for Child. *See id*. 49-50. Foster Mother also explained that she has engaged resources for Child, namely mental health therapy and occupational therapy, because Child has displayed aggressive behaviors at times. *See id*. at 44-48.

In sum, we conclude the record supports a finding that in the more than fifteen months since Child was in CYF's custody, Mother's progress was minimal to moderate, and she had not made reunification a realistic prospect. We acknowledge that Mother had made some progress and demonstrated an increased willingness to work toward reunification before the September 2023 hearing. Nevertheless, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Interest of H.J.*, 206 A.3d at 25 (internal citation and quotations marks omitted). Furthermore, Child's best interest, including Child's interest in permanency, controls, not necessarily Mother's progress or her bond with Child. *See Interest of J.B.*, 296 A.3d 1234, 1239 (Pa. Super. 2023). Based on the foregoing, we discern no abuse of discretion by the dependency court

in determining that it is in Child's best interest to change her permanency goal to adoption.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/20/2024