J-A25017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.M.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 672 MDA 2019 |

Appeal from the Decree Entered April 2, 2019
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-0195a

| | | |
|---|---|---|
| IN THE INTEREST OF: S.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.M.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 713 MDA 2019 |

Appeal from the Order Entered April 3, 2019
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000024-2009

BEFORE:  STABILE, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: DECEMBER 23, 2019**

C.L.M.H. ("Mother") appeals from the orders changing the permanency goal for S.A.P. ("Child") to adoption and terminating her parental rights to Child. We conclude the trial court did not abuse its discretion in changing the permanency goal or in terminating Mother's parental rights and therefore affirm.

Child was born in July 2006 to Mother and W.C.P. ("Father"). In August 2016, York County Office of Children, Youth and Families ("CYF") received a referral regarding sexual abuse allegations made by Child's half-sibling against Mother's boyfriend, A.M., Jr., with whom Mother and her children resided. Mother did not permit Child to undergo a forensic interview at that time. A CYF caseworker interviewed Child. Child did not disclose abuse, but the caseworker had concerns that Child had been "coached." Trial Court Opinion, filed Apr. 2, 2019, at 9 ("1925(a) Op."). Mother insisted Child's half-sibling was lying about the abuse.

In December 2016, CYF filed an application for emergency protective custody of Child following allegations that A.M., Jr., sexually abused Child. The court granted the application. Child underwent a forensic interview, where Child disclosed abuse and indicated Mother instructed her to lie about it. 1925(a) Op. at 10. CYF filed a dependency petition, and in January 2017, Child was adjudicated dependent. The initial permanency goal was return to parent or guardian.

CYF filed a petition for involuntary termination of parental rights in November 2017, but withdrew this petition. In July 2018, Mother filed a petition for reunification. In August 2018, CYF filed a second petition for involuntary termination of parental rights and a petition to change goal to adoption. The court held a three-day hearing on the petitions.

The program coordinator for Family Engagement Services at Pressley Ridge, Melanie Ferree-Wurster, testified. Pressley Ridge provided services to

Mother from December 2017 through October 2018. N.T., 11/20/18, at 14. During the time Pressley Ridge provided services, Mother participated in at least 65 to 70 visits with Child and attended meetings. *Id.* at 16, 18.

The family engagement specialist at Pressley Ridge, Carla Arp, supervised visits between Mother and Child and testified that Mother was consistent with visits. *Id.* at 20. Arp testified that from December 2017 through May 2018, Mother had fully supervised visits. *Id.* at 22. Mother then had five partially supervised visits. *Id.* The visits returned to fully supervised after A.M., Jr., appeared at a partially supervised visit. *Id.* Mother then had nine fully supervised visits, before the court again ordered that she could have partially supervised visits. *Id.* Mother had nine partially supervised visits, which returned to fully supervised after an unauthorized male was at a visit in August 2018. *Id.*

Arp testified that it was "reported to [her] that [Mother] was continuing to have some contact with [A.M., Jr.]" *Id.* at 22-23. In addition, Child described times where A.M., Jr., would follow Child home from school in his car. *Id.* at 39. The reports of A.M., Jr., following Child were outside of Mother's time with Child. *Id.*

Arp also testified regarding the man who was in Mother's home during the August 2018 visit. She stated that Child reported that a man, A.T., had been at the visit. *Id.* at 26. Mother initially denied he was there, and later stated that she spoke with her roommate, who informed her a man had been there. *Id.* at 27. Arp testified that it was later reported to her, and there was

testimony at permanency review hearing, that Mother "might possibly have a romantic relationship with [A.T.]." *Id.* at 28. Child reported that she saw A.T.'s name in Mother's phone with hearts around it, and Arp later saw Mother's phone, with A.T.'s name surrounded by hearts. *Id.* Mother continued to deny a romantic involvement with A.T. *Id.* at 28-29.

Arp further testified that although Child initially said she did not know A.T., after a subsequent visit with Mother, Child stated she did not know "why the team was causing her mother so much drama," and she had known A.T. since "she was in the womb." *Id.* at 38.

Arp testified that because someone who was not authorized was at the home during a visit, CYF filed a motion to change the partially supervised visits to fully supervised visits, and the court granted the motion. *Id.* at 21. After the change to fully-supervised visits, Mother became difficult to work with, as she would not look at or speak to Arp. *Id.* at 21. This created a hostile environment, which was contrary to the goal of creating a positive visit for Child and Mother, and Pressley Ridge discontinued services. *Id.*

Arp testified that Pressley Ridge had concerns during the entire service. *Id.* at 63. The concerns included that Mother did not want to have contact with Child's half-sibling, who was transgender, and that Mother did not want Child to have contact with her half-sibling. *Id.* In addition, at an October 2018 permanency review hearing, Arp testified that Mother began to teach Child some "alarming" things, such as that "when you are in the grave after death, your grave squeezes you and tortures you for the sins you committed when

you were alive." N.T., 10/11/18, at 46. She stated she was not "questioning the veracity" of the belief, but "the method in which [Child] was told." *Id.* at 46-47. Arp stated the way Mother "told [Child] was so scary to [Child] that she got in the car and said she was freaked out." *Id.* at 47. She clarified that "to say things that give [Child] nightmares, that's not the way to teach a child at any age any religion." *Id.* at 57.

The parties stipulated to the admission of a non-offending parent evaluation prepared by Camilla Richesson and two exhibits prepared by Juanita Jones from SpiriTrust Lutheran, who provided non-offending parent counseling, in lieu of testimony. N.T., 11/20/18, at 81.[1] The evaluation prepared by Richesson included an assessment that the allegations were too difficult for Mother to believe, providing that Mother:

> [D]enie[d] that she has ever been fully informed of the specific nature of the sexual abuse allegations regarding [Child], which this evaluator finds difficult to believe. Rather, it appears that the allegations are too difficult for her to admit happening because she would then have to place some culpability on herself for what was happening 'right under my nose.'

Non-Offending Parent Evaluation, CYF Exh. 1, at 7. The evaluator believed Mother's disbelief added to Child's trauma. *Id.* at 8. Jones' report included that to state Mother was "in denial was overly simplified. She was not so much in denial as incredulous and just not understanding how sexual abuse could have occurred." SpiriTrust Report, dated Mar. 23, 2018, at 1.

---

[1] The parties further stipulated to the psychological evaluation of Child prepared by Dr. Casey Flanscha.

A mental health professional from Pressley Ridge, Mallary Hinkle, also testified. Hinkle provided services for Child and Mother from May 2018 through October 2018. *Id.* at 87. Mother was present for the counseling sessions and Hinkle testified that communication between Child and Mother "seem[ed] to have increased during the sessions," and she worked with Child to create a plan to implement if she felt unsafe. *Id.* Hinkle testified that Mother seemed to recognize the issues posed by A.M., Jr., and his abuse of Child, and was not in denial of the abuse. *Id.* at 90. Hinkle stated that Mother did claim that Child had a tendency to lie. *Id.* Hinkle stated that Mother did not support Child continuing to have visits with her half-sibling. *Id.* at 95.

A mobile therapist with Laurel Life, Rachel Cook, also testified. Cook provided cognitive behavioral therapy to Child at school and at home, beginning in October 2018. N.T., 11/20/18, at 73. She testified that Child's goals included increasing self-regulation and utilizing coping skills, documenting things related to abuse and establishing healthy relationships, and increasing compliance with rules. *Id.* at 75-76. Child is progressing at a normal rate in therapy.

Child testified at the hearing. Child testified that she would like to live with Mother or Father. *Id.* at 113. She stated she would like to live with Mother because living with her makes Child "feel . . . like a bunch of things [are] in front of [her]." *Id.* She testified Mother lived with a roommate and the roommate's daughters. *Id.* at 115. Child was unsure whether Mother was married to A.T. *Id.* at 140-41.

A youth advocate at Pennsylvania Comprehensive Behavioral Health, Damaris Clark, testified at the hearing. N.T., 1/24/2019, at 11. She started to work with Child in April 2018, and continued to work with her at the time of the hearing. *Id.* at 11. She stated that Child "believes everything that Mom says, and when it doesn't happen the way Mom says, then [Child] gets angry with everybody, and everybody is at fault." *Id.* at 18.

A CYF caseworker, Bryna Smith, testified. She stated that prior to the December 2016 referral to CYF that started the current dependency proceedings, CYF had received 26 prior referrals regarding the family. *Id.* at 21. Mother's permanency goals included to support her own mental health and to engage in mental health therapy for Child. *Id.* at 28. Smith testified that Mother did attend some counseling sessions at Access York, but did not complete a psychological evaluation that CYF requested. *Id.* at 69.

Smith testified that Mother had lived at various residences, and that CYF often learned of the moves through collateral sources, not Mother. *Id.* at 31. For her current residence, Mother advised CYF that she was residing with a friend from church, and would be able to live there indefinitely. *Id.* at 32. Smith testified that it was reported that the friend no longer lives there, and that Mother lives there with her husband. *Id.* Although the home has space for Child, Mother did not provide updated lease information after the roommate moved. *Id.* at 32-33.

Smith also testified that Mother provided paycheck stubs from May and April 2018, but has not provided paycheck stubs since that time, even though

CYF had requested them. *Id.* at 40. Smith testified that after A.M., Jr., appeared at a partially supervised visits, Mother stated she would contact the police, but did not do so. *Id.* at 45. Mother did report the incident to A.M, Jr.'s probation officer. N.T., 7/24/18, at 21.

Smith testified that Mother was pregnant. N.T., 1/24/19, at 46. She stated that Mother "never confirmed" her pregnancy with CYF, but CYF "ha[d] been made aware" of the pregnancy. *Id.* She stated a Justice Works employee informed Smith that Mother was in the hospital with contractions the week before the hearing and that the week before that, Mother had taken Child shopping for the baby during a supervised visit. *Id.* at 47-48.

Smith testified that Child has a bond with Mother, but it is an unhealthy bond. *Id.* at 53. She stated that Child "wishes to please [M]other, even if it sacrifices her own personal beliefs." *Id.* She stated that Child "strives to appease her mother, even though it . . . directly affects her mental health and positions that she stands for such as her religion and maintaining contact specific to her older [half-]sibling." *Id.* Smith testified that Child's "mental health declines when she feels like she is not appeasing [M]other." *Id.* at 61. Smith testified that Child and her current foster mother, her aunt, were "definitely bonded." *Id.* at 63. She stated Child "did have a spike in behaviors, and her aunt is somewhat structured, but, through her therapy and child prep, she has very much . . . become bonded with her aunt and interacts with her very well." *Id.* at 63-64.

Smith stated that CYF believed that it was in Child's best interest to change the permanency goal from reunification to adoption because "[i]t's the most permanent achievable goal for the child to be able to feel comfortable and safe and stable knowing that this is her permanent home." *Id.* at 71-72. She stated Mother was not in a positon to take custody of Child, as Mother continued to have supervised visits with Child due to questions concerning "Mother's protective capacities," and the concerns would be better able to be addressed had Mother had a mental health evaluation "to see that she would be mentally sound to care for" Child." *Id.* at 72-73.

Smith further testified that at an October court proceeding, Mother testified that if she was reunified with Child, and after Father was released from prison, she would send Child to live with Father, and Child would visit her and her husband on the weekends. *Id.* at 74. Further, although Mother participated in school-based therapy through Pressley Ridge, she did not want Child to continue with the program during the summer because she did not believe Child needed treatment. *Id.* at 75. Smith testified that Mother declined to participate in therapy during visitations, and that Mother cooperated with services but did not follow through with all the recommendations made by CYF. *Id.* at 75, 97. She testified termination of parental rights would be in Child's best interest so that Child "knows that she is in a stable position to gauge the rest of her life." *Id.* at 98.

A school psychologist, Holly Ray, also testified. She testified that Child "started out the year rough, and . . . gradually got better." *Id.* at 80. She now

was "better than she had been before." *Id.* She stated that Child appeared to have some stability since she had been placed with her aunt. *Id.* at 81. She has been "more stable and more focused at school," and Ray has seen Child less for "just being upset or having drama with other people." *Id.*

Mother testified at the hearing. N.T., 2/1/19. Mother testified that she does not have contact with A.M., Jr., the individual who abused child. *Id.* at 42. Mother testified she believes A.M., Jr., was grooming Child and that she "never had any disbelief." *Id.* at 42-43. She claims she did not know the details of the allegations, which were kept from her until her non-offender sessions with Jones. *Id.* at 43. Mother testified she completed the non-offender treatment, through sessions with Jones, and she completed domestic violence counseling. *Id.* at 43-44. Mother testified that she believed Child would benefit from counseling, stating it would help with Child's "anger, how to process it, instead of just lashing out. Help her to express herself a little bit better." *Id.* at 44. She would be willing to continue treatment if reunified with Child. *Id.*

Mother testified that she currently lives with A.T., her husband. *Id.* at 54-55. Mother testified that she completed a treatment assessment and domestic violence and non-offender counseling, she attended visits with Child, had positive and supportive interactions with Child, and did not discuss the allegations of abuse with the other children. *Id.* at 55-57. Mother did not provide CYF with documentation that she completed domestic violence counseling. *Id.* at 80-81. She stated she never told Child that Child was lying

or being dishonest. *Id.* at 58. Mother also testified that she signed the necessary releases, obtained housing separate from A.M., Jr., and completed parenting coaching. *Id.* at 59-60. Mother also testified that she maintained contact with CYF and informed it of household composition changes. *Id.* She informed the court and CYF at the October hearing she was living with A.T. and provided his information. *Id.* at 65. She participated with school-based therapy, where she apologized to Child. *Id.* at 61. Mother testified that she currently supports visits between Child and Child's half-sibling. *Id.* at 79.

Mother testified that she has a job at the Susquehanna Nursing Home, but was not able to work at the time of the hearing due to sciatic pain. *Id.* at 65-66. Mother testified that she no longer intends to give custody of Child to Father. *Id.* at 96.

The trial court changed Child's permanency goal to adoption and granted CYF's petition to terminate Mother's parental rights to Child.[2] Mother filed timely notices of appeal from the orders. Child also filed notices of appeal, but subsequently withdrew the appeals.

Mother raises the following issues on appeal:

> I. Did the trial court err when it changed the court ordered goal from reunification to adoption?
>
> II. Did the trial court err when it involuntarily terminated the parental rights of [Mother]?

---

[2] The trial court also terminated Father's parental rights to Child. Father has not filed an appeal.

III. Did the trial court err in determining that termination of parental rights would be in the best interest of the child?

Mother's Br. at 4.

Mother first challenges the order changing the permanency goal to adoption. She argues that the evidence did not support a goal change to adoption. Rather, Mother claims she satisfactorily completed every task asked of her, but CYF "continued to pile up task upon task and held actions outside of her control against Mother." Mother's Br. at 18. Mother argues she had completed the service plan, had an appropriate home, and Mother and Child were ready and excited for reunification. The circumstances that necessitated placement were dealt with when A.M., Jr., moved from the home. *Id.* at 19.

"We review an order regarding a placement goal of a dependent child under an abuse of discretion standard." *In re H.J.*, 206 A.3d 22, 25 (Pa.Super. 2019) (citing *In re B.S.*, 861 A.2d 974, 976 (Pa.Super. 2004)). We conclude a court abused its discretion only where "the court's judgment was manifestly unreasonable, . . . the court did not apply the law, or . . . the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." *Id.* (quoting *In re N.C.*, 909 A.2d 818, 822-23 (Pa.Super. 2006)).

"[W]e are bound by the facts as found by the trial court if they are supported by the record." *Id.* (citing *In re K.J.*, 27 A.3d 236, 241 (Pa.Super. 2011)). The trial court must "evaluate the credibility of the witnesses and resolve any conflicts in the testimony." *Id.* (citing *In re N.C.*, 909 A.2d at 823). Where "the trial court's findings are supported by competent evidence, this Court will affirm, 'even if the record could also support an opposite

result.'" ***Id.*** (quoting ***In re Adoption of R.J.S.***, 901 A.2d 502, 506 (Pa.Super. 2006)).

"[T]he focus of all dependency proceedings, including goal change proceedings, is on the safety, permanency, and well-being of the child and the best interests of the child must take precedence over all other considerations." ***Id.*** (citing ***In re A.K.***, 936 A.2d 528, 534 (Pa.Super. 2007)). "At each dependency review hearing, the trial court must consider, *inter alia*, the continuing necessity for and appropriateness of the [c]hild's placement, and the appropriateness and feasibility of the current placement goal for the child." ***Id.*** (citing 42 Pa.C.S.A. § 6351(f)(1), (4)). Where a court finds "reunification with the child's parent is not in a child's best interest, the court may determine that [a]doption is the appropriate permanency goal." ***Id.*** (citing 42 Pa.C.S.A. § 6351(f)(1)-(2)). Further, "[w]hen the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." ***Id.*** (citing ***In re N.C.***, 909 A.2d at 823).

Here, the trial court concluded that CYF proved by clear and convincing evidence that it is in Child's best interest to change the goal placement to adoption. The court noted that CYF had "extensive involvement in the past" with Mother, Child, and Mother's other children. 1925(a) Op. at 9. It noted that Child's half-sibling was sexually abused by A.M., Jr., and Mother refused to allow Child to undergo a forensic interview at that time. ***Id.*** A CYF

- 13 -

caseworker interviewed Child, and had concerns that Child had been coached. *Id.* Mother insisted Child's half-sibling was lying, and did not permit the half-sibling to return home. *Id.* About five months later, CYF received a referral regarding alleged sexual abuse of Child by A.M., Jr. *Id.* At a forensic interview, Child disclosed sexual abuse and indicated that Mother instructed her to lie about it. *Id.* at 9-10.

The court further noted that the non-offending parent evaluation conducted in June 2017 stated that Mother continued to believe both children made up the sexual abuse. *Id.* at 10. The court noted that Mother denied being informed of the specific nature of the abuse and noted that it appeared the allegations were "too difficult for [Mother] to admit." *Id.* (alteration in original). The evaluator stated that Mother added to the trauma of Child by her non-belief. *Id.*

The court noted Mother attended the SpiriTrust Lutheran Domestic Abuse Program, and the counselor stated that Mother was not in denial of the abuse to Child but that she "could not comprehend how the abuse could have occurred." *Id.* at 11.

The court also noted that at an October 2017 permanency review hearing, Mother stated she never denied Child was abused and denied telling Child to lie about the abuse. At a February 2019 hearing, Mother stated she never called Child a liar. These statements contradicted her earlier testimony and prior statements from Child. *Id.*

The court noted Mother's numerous inconsistent statements—including her inconsistent statements regarding her marital status, her pregnancy status, and her living/roommate situation. *Id.* at 12-13. It found Mother remarried without informing CYF or Child, and that her spouse did not participate in any of the dependency proceedings. *Id.* at 13.

The Court noted it was "highly concerned about Mother's ability to appropriately protect [Child], including as it relates to [Child's] emotional and mental health." *Id.* The court noted that, although Mother at times had unsupervised or partially supervised visits, they were returned to fully supervised visits after Child's report of a man in Mother's home and Mother's subsequent attempts to deny or explain the man's presence. *Id.* at 14-15.

The court concluded:

> Overall, Mother has made minimal to moderate progress towards alleviating the circumstances which caused [Child] to be placed. . . . [Mother has not] assumed any major parental duties for [Child] since approximately December, 2016, over twenty-seven (27) months ago. [Child] has been in placement for approximately twenty-seven (27) months and adjudicated dependent for approximately twenty-six (26) months. [Child] needs a permanent, safe and stable environment. As such, the Court finds that [Child's] best interests demand that the goal be changed from reunification with a parent to placement for adoption.

*Id.* at 16.

The trial court did not abuse its discretion in determining it would be in Child's best interest to change the permanency goal to adoption. Although Mother had completed many of her goals, CYF and the trial court continued to

have concerns about her ability to protect Child from future abuse. Although Mother was no longer living with A.M., Jr., she now was married to a man that CYF and the court had not met. She continued to provide testimony that contradicted earlier testimony, and continued to provide inconsistent information as to her marital status and whether she was pregnant.

Mother next argues the trial court erred in terminating her parental rights.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. **In re Adoption of K.C.**, 199 A.3d 470, 473 (Pa.Super. 2018). Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." **Id.** (quoting **In re Z.S.**, 946 A.2d 726, 728 (Pa.Super. 2008)).

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (quoting **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." **In re Adoption of K.C.**, 199 A.3d at 473. A trial court decision may be reversed for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **In re Adoption of S.P.**, 47 A.3d at 826.

- 16 -

Our Supreme Court has explained the reasons for applying an abuse of

discretion standard of review in termination of parental rights cases:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (citations omitted).

Termination of parental rights is controlled by Section 2511 of the

Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section

2511, the trial court must engage in a bifurcated analysis prior to terminating

parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted).

- 17 -

In the present case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8) and § 2511(b) of the Adoption Act. To affirm the termination of parental rights, this Court need only agree with the trial court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we affirm that the trial court properly terminated Mother's parental rights pursuant to Sections 2511(a)(2) and (b).

We will first review the trial court's conclusion that termination was proper under Section 2511(a)(2), which provides:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ...
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence of the following: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or

refusal cannot or will not be remedied." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003); 23 Pa.C.S.A. § 2511(a)(2).

Mother argues that CYF presented no competent evidence to support a finding of "repeated and continued incapacity, abuse, neglect or refusal" that "caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being" or that the "conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." Mother's Br. at 22. She argues that there was no evidence that Mother knew A.M., Jr., would appear at a visit, and that Mother had no control over his actions. ***Id.*** She claims that the court's use of this incident against her should be "enough to overturn the court's findings as bias." ***Id.*** at 23.

The trial court found CYF establish by clear and convincing evidence that grounds for termination exist under Section 2511(a)(2):

> The Court finds that the conditions which led to [Child's] placement outside the care and custody of Mother and Father continue to exist. [Child] has been in placement for approximately twenty-seven (27) months and adjudicated dependent for approximately twenty-six (26) months. [Child] is safe, loved, and well-bonded to the kinship mother.
>
> The Court continued to have significant concerns regarding Mother's ability to appropriately parent and protect [Child]. Despite Mother's most recent statements to the contrary, the Court fully believes that Mother still does not believe that [Child] was sexually abused by [A.M., Jr.].
>
> [Child] has been in placement for approximately twenty-seven (27) months and adjudicated dependent for approximately twenty-six (26) months. Despite the length of [CYF's] involvement with the family, Mother [has] failed to progress to fully unsupervised visits with [Child].

1925(a) Op. at 20.

The court further re-iterated the findings it made to support the goal change. It noted Mother did not believe the sexual abuse allegations made by Child or her half-sibling, that the allegations were "too difficult for [Mother] to admit," and that Mother added to Child's trauma by not believing her. *Id.* at 22. It noted Mother's testimony that she never stated Child had not been abused or that Child was lying, which was contradicted by her prior testimony. *Id.* at 23. The court noted it did not find Mother credible, due to the many inconsistent and misleading statements she made during the course of the proceedings. *Id.* The court noted it was "highly concerned about Mother's ability to appropriately protect [Child], including as it relates to [Child's] emotional and mental health." *Id.* at 25. It noted that A.M., Jr., appeared outside one of Child's visits, and Mother informed Child she would contact the police. Mother did not contact the police, but did testify that she contacted A.M., Jr.'s probation officer twice – the day following the incident and four days after the incident. *Id.* It further noted Mother's inconsistent statements concerning the man Child reported seeing at a visit, who was her husband. The court further noted that Mother was speaking to Child about concerning topics, such as being tortured for sins. *Id.* at 26. The court further noted that Mother did not provide information to verify her place of employment or salary or her residence. *Id.* at 27. In addition, the court noted that Mother testified that, because of her religious beliefs, she intended to turn custody over to

Father. Although Mother later testified that she would not do so, the Court did not find Mother's recantation credible. *Id.*

The court concluded:

> Overall, Mother [has] failed to remediate the conditions which led to [Child's] placement and [has] failed to provide substantial parental duties on behalf of [Child]. In consideration of this testimony, the Court [found] that [CYF] clearly and convincingly establish that termination of parental rights is justified pursuant to Section[] 2511(a)(2).

1925(a) Op. at 28.

The trial court did not abuse its discretion in finding termination proper under Section 2511(a)(2). Mother provided inconsistent testimony, including inconsistent testimony concerning her marital status and housing situation. Her inability to believe Child was sexually abused, coupled with this inconsistent testimony, supports the finding that Mother is not able to protect Child. The court's mention that A.M., Jr., arrived during one of Child's visits with Mother, even though Mother may not have known he would do so, does not establish the court was biased. It was one of many pieces of relevant information the court used to determine that termination was proper under Section 2511(a)(2).

Mother next argues the court erred in finding that termination of her parental rights was in Child's best interests.

Pursuant to Section 2511(b), the trial court must determine the needs and welfare of the child under the standard of best interests of the child. The focus under Section 2511(b) is not on the parent, but on the child. *In re*

*Adoption of R.J.S.*, 901 A.2d at 508. Pursuant to Section 2511(b), the trial court must determine "whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super. 2005). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id.* at 1287. The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* Importantly, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Instead, the trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* (quotation marks and citation omitted). Further, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

The trial court found termination was in Child's best interest:

> The Court has thoroughly evaluated [Child's] relationships in this matter. The Court finds that [Child] has a relationship with mother . . . but [it is not] strong, safe, stable, or healthy for [Child]. . . . Mother's bond with [C]hild is . . . unhealthy. Mother has consistently been untruthful with [C]hild as it relates to Mother's current marriage and pregnancy. Mother is also unsupportive of [C]hild's relationship with her half-sibling. As such, the Court find that [Child] has a healthier parental bond with the kinship

- 22 -

> mother and that [Child] gains safety and stability from the kinship mother. It is the kinship mother who provides for [Child's] daily needs as well as her specialized developmental, education, and medical needs.
>
> The Court also finds that the bond between [Child] and kinship mother is strong and healthy. Testimony established that [C]hild is happy and feels comfortable in the kinship mother's care. The bond that [Child] has with the kinship mother can provide safety, security and permanency for [C]hild. Termination of parental rights will best meet the needs of [Child] and permit [C]hild to achieve the stability she deserves.

1925(a) Op. at 28-29.

The trial court's factual findings are supported by the record and it did not abuse its discretion in finding termination would be in Child's best interest. Although Child has a bond with Mother, the bond is not a healthy one. Mother did not believe Child when Child informed her she was sexually abused, and Mother provided inconsistent information to Child regarding important life matters, such as marriage and pregnancy.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2019