909 A.2d 818 (2006)
In the Matter of N.C.
In the Matter of A.C.
In the Matter of L.C., Dependent Juveniles.
Appeal of Y.C., Natural Mother.
In the Matter of L.C.
In the Matter of N.C.[1]
Appeal of Y.C., Natural Mother.
In the Matter of A.C.
Appeal of Y.C., Natural Mother.
Superior Court of Pennsylvania.
Submitted June 26, 2006.
Filed October 10, 2006.
*820 Kathleen K. Shaulis, Carlisle, for appellant.
Jane Adams, Carlisle, Guardian Ad Litem, for appellee.
Michael J. Whare, Carlisle, for M.H., appellee.
Sean M. Schultz, Carlisle, for Paternal Grandmother, appellee.
BEFORE: LALLY-GREEN, McCAFFERY, and COLVILLE[*], JJ.
OPINION BY McCAFFERY, J.:
¶ 1 Appellant, Y.C. ("Mother"), appeals from the orders of the Cumberland County Court of Common Pleas that changed the placement goal for two of her dependent children from reunification to adoption. Specifically, Mother asks us to determine whether her substantial compliance with the permanency plan precluded the trial court from changing the placement goal to adoption. After careful consideration, we determine that the trial court did not err in changing the goal; hence, we affirm.
¶ 2 The facts and procedural history of this case are as follows. Mother has five children, all of whom have been dependent for a substantial portion of their lives. This appeal concerns only two of the children: a boy, N.C., born on March 29, 1992, and a girl, A.C., born on January 14, 2004. The other three children are all female: S.C., born on July 3, 1998; M.C., born on June 11, 1999; and L.C., born on December 28, 2000. The five children have three different fathers, none of whom are parties to the present appeal.[2]
¶ 3 N.C. was declared dependent in June 2002, after Mother left him unsupervised for extended periods of time at a point in her life when Mother was dealing with legal and other problems related to allegations of theft. Cumberland County Children and Youth Services ("CYS") placed N.C. with a family member for several months before returning him to Mother's care. Mother was ultimately placed on probation for the theft charges.
¶ 4 In March 2003, following an emergency placement hearing, the court found that Mother's three other children, as well as N.C., were all dependent and ordered emergency placement. The primary reason for the emergency placement was that a sex offender, B.G., who had served a prison term for the attempted rape of a child, had been observed in Mother's home, in contact with the children. Mother and B.G. apparently had a brief relationship, which she appeared reluctant to end. There was also concern because Mother had tested positive for marijuana, *821 and had neither undergone psychiatric evaluation nor enrolled N.C. in counseling, as ordered by the court in 2002.
¶ 5 Placement hearings were held at regular intervals over the course of the next three years. Although Mother faced additional theft charges, she also made some progress. She underwent drug and alcohol evaluation and psychiatric evaluation. Mental health counseling and individual therapy were recommended, as was family therapy to help N.C. address his anger at Mother. Mother participated in the counseling and therapy, she completed a parenting program, and she also enjoyed approximately weekly visitation with her children.
¶ 6 Mother delivered her fifth child, A.C., on January 1, 2004. Prior to this birth, Mother's relationship with B.G. appeared to have ended. In March 2004, L.C. was returned to Mother's care and custody, although her dependency and protective services continued. Mother was cooperative with the agency, making progress, and concerned about reuniting with her other children.
¶ 7 In June 2004, when A.C. was five months old, Mother was arrested for driving under the influence of alcohol and related charges. CYS filed a petition for an emergency hearing, as Mother was incarcerated for violating her probation, and thus the two children living with her, A.C. and L.C., were without parental care and control. The court determined that both children were dependent, and placed L.C. with her paternal grandmother and A.C. in a foster home. Mother was in prison until July 29, 2004, at which time she was released on parole and ordered to participate in drug and alcohol counseling and individual counseling. Over the next few months, Mother again made progress, participating in individual and family counseling and obtaining employment.
¶ 8 N.C. struggled with the upheaval in his life and with his anger toward Mother. During certain periods he refused to see Mother, although he did finally acquiesce to meeting with Mother in a therapeutic setting in the presence of his counselor. He had some problems in school and in his foster home. In September 2005, he was moved to another foster home, one where A.C. was also residing. His new foster parents raised concerns about his exhibiting some inappropriate sexual behaviors. In addition, he made allegations of sexual abuse by a male relative that had occurred years before, prior to his placement into foster care.
¶ 9 A hearing was held on November 9, 2005, at which time CYS sought a goal change from reunification to adoption for N.C. and A.C.[3] With regard to A.C., the court granted the goal change to adoption, ordered an assessment of the bond between A.C. and Mother, and continued visitation with Mother. With regard to N.C., the court changed his placement goal to another planned placement intended to be permanent, continued his individual counseling, continued supervised visitation with Mother, and noted that a goal change to adoption might be considered at the next permanency hearing. Indeed, after the next hearing, on February 8, 2006, the court did change N.C.'s placement goal to adoption and ended visitation with Mother. A third hearing was held on February 15, 2006, for the sole purpose of receiving the testimony of the expert who had conducted a bonding assessment with regard both to A.C. and Mother and to A.C. and her *822 foster parents. Following this hearing, the court ordered discontinuation of the visitation between Mother and A.C.
¶ 10 Mother filed a timely appeal. Mother's brief raises numerous issues for review, which were summarized as headings in her brief as follows:[4]
A. [The trial court abused its discretion in changing the placement goal for N.C. and A.C. to adoption given that,] since the children have been in placement, Mother has diligently pursed the completion of her permanency plan and the return home of her children.
B. [The trial court abused its discretion in changing the placement goal for N.C. and A.C. to adoption given that,] at the November 9, 2005 hearing[,] the juvenile court explicitly ignored Mother's compliance with her permanency plan and the progress that she made in alleviating the circumstances that caused her children to have been placed outside her home.
C. [The trial court abused its discretion in changing the placement goal for N.C. and A.C. to adoption since] CCC & YS [has] not made reasonable efforts to reunite [N.C. and A.C. with] Mother and at times [has] made decisions that seem to thwart the reunification.
D. Because the goal changes were unjustified by law or by the evidence, there is no basis for the court to end visitation between Mother and N.C. and [A.C.].[5]
(Mother's Brief at 26, 31, 40, 47-48).
¶ 11 We note first our standard of review. When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In re G.P.-R., 851 A.2d 967, 973 (Pa.Super.2004). In order to *823 conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. Id. (citation omitted). We are bound by the trial court's findings of fact that have support in the record. Id. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. In re Adoption of R.J.S., 901 A.2d 502, 506 (Pa.Super.2006). When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result." Id. (quoting In re In the Interest of S.H., 879 A.2d 802, 806 (Pa.Super.2005), appeal denied, 586 Pa. 751, 892 A.2d 824 (2005)).
¶ 12 Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act,[6] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA").[7]See In re C.B., 861 A.2d 287, 295 (Pa.Super.2004), appeal denied, 582 Pa. 692, 871 A.2d 187 (2005); G.P.-R., supra at 975. The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. See C.B., supra; G.P.-R., supra. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents. C.B., supra; G.P.-R., supra at 973.
¶ 13 At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:
the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.
In re J.H., 788 A.2d 1006, 1008 (Pa.Super.2001) (citing 42 Pa.C.S.A. § 6351(f)) (other citations omitted). Matters of custody and placement for a dependent child must be decided under the standard of the child's best interests, not those of his or her parents. G.P.-R, supra at 973.
¶ 14 When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. Id. This Court has held that the placement process should be completed within 18 months. Id. at 976. As this Court has stated previously,
Pennsylvania . . . [is] required to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by . . . reasonable efforts, [the Commonwealth is then required] to *824 move toward termination of parental rights and placement of the child through adoption. . . . [W]hen a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require [the child welfare agency] and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated [that] this process realistically should be completed within 18 months.

Id. at 975-76 (quoting In re B.L.L., 787 A.2d 1007, 1016 (Pa.Super.2001) (emphasis added)). While this 18-month time frame may in some circumstances seem short, it is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa.Super.2003).
¶ 15 A placement goal change to adoption does not terminate the parents' rights; however, it is a step in that direction. In re A.L.D., 797 A.2d 326, 339 (Pa.Super.2002).
By allowing [the agency] to change its goal to adoption, the trial court has decided that [the agency] has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. In other words, the trial court order is the decision that allows [the agency] to give up on the parent.
Id. (emphasis in original) (quotation and citation omitted).
¶ 16 We turn now to Mother's issues on appeal. We will consider her first two issues together, as they both argue in essence that the trial court abused its discretion in ordering a placement goal change to adoption when Mother had largely complied with the provisions of her permanency plan, had alleviated the circumstances that had led to the children's original placement, and had diligently worked for reunification with her children. (Mother's Brief at 26-40). We cannot accept Mother's argument.
¶ 17 Initially, we must point out that Mother appears to ignore the impact of the modifications to the Juvenile Act mandated by ASFA. Contrary to the implications of Mother's argument, the focus of dependency proceedings is on the children's safety, permanency, and well-beingnot on Mother's conduct. See C.B., supra at 295; G.P.-R., supra at 973; J.H., supra at 1008.[8] The trial court properly focused on the children and properly made its decision on the basis of their best interests. (See Trial Court Opinions, dated April 17, 2006, at 6; and dated April 26, 2006, at 3; Notes of Testimony ("N.T.") Goal Change Hearing, 11/9/05, at 128).[9]
*825 ¶ 18 Next, we conclude that there is support in the record for the trial court's finding that, while Mother has made substantial progress toward achieving the goals of her permanency plan, her parenting skills, including her judgment with regard to the emotional well-being of her children, remain problematic. (Trial Court Opinion, dated April 17, 2006, at 3-4, 4 n. 8, and 6). At the hearings conducted on November 9, 2005, and February 8, 2006, the court heard conflicting testimony regarding Mother's parenting abilities. Thus, after hearing all the evidence, the trial court was required to make a credibility determination, to which we as an appellate court must extend great deference.
¶ 19 Several witnesses testified as to their observations of ongoing issues with Mother's parenting abilities. Diane Dayton, a therapist who was counseling N.C. about his sexually inappropriate behaviors and his allegations of sexual abuse, testified that Mother's responses during family therapy with N.C. had not been helpful and had inappropriately pressured N.C. (N.T., 11/9/05 at 13, 15-16, 19-20). For example, when N.C. confronted Mother with an allegation of physical abuse by a male relative, her response was to attempt to justify the injury inflicted on him. (Id. at 20). In addition, Ms. Dayton testified that Mother's discussions with N.C. concerning her possible impending marriage placed N.C. in a horrible position, as he was a child and she was discussing issues with him as an adult. (Id. at 24). Ms. Dayton had many concerns about N.C.'s emotional and mental stability, and she supported the goal change to adoption because it would provide N.C. with the permanency and stability that he needed to work through his many issues. (Id. at 13, 15).
¶ 20 Janelle Carbaugh, a CYS case manager who had worked with the family, testified that while Mother "has made great strides to become a better parent," she has not been consistent with her parenting. (Id. at 40; see also id. at 47). She further testified that Mother's style of discipline was a matter of particular concern. (Id. at 47).
¶ 21 Sue Williams, who was the foster care case manager for N.C. and A.C. and had supervised visits between N.C. and Mother, was another witness. She testified that although the visits went fairly well, N.C. was not interested or excited about them, but rather appeared indifferent and would not initiate a visit. (N.T., 2/8/06, at 79-80, 83). In addition, she testified that N.C. acted more like an adult than did Mother. (Id. at 79). Mother tended to cut off N.C.'s explanations of events of interest to him and to bring up issues that were not entirely age-appropriate for N.C. (Id. at 80).
¶ 22 Another witness was Kathy Austin, who testified as to her observations during the period of time from November 2005, until January 2006, when Mother was renting a bedroom in her home. She testified that when A.C. and her three sisters visited the home, Mother was unable to handle the children and became very angry, often screaming and swearing at them. (Id. at 71).
¶ 23 N.C. and A.C.'s foster mother testified that after two recent day-long visits with Mother, A.C. appeared not to have been fed; when she returned home, she shoveled food in her mouth with her hands as quickly as possible and ate two or three times more than she usually did. (Id. at 114). In addition, the foster mother was concerned that A.C. had not had a nap during the day-long visitation.
¶ 24 Finally, Dr. David J. Lillenstein, who had prepared an assessment of the bonding between A.C. and Mother and between A.C. and her foster parents, testified *826 that Mother told him that she did "really good with the little [children]" but that her problems were "with the older ones, like the four-year-old and the thirteen-year-old." (N.T., 2/15/06, at 3). This statement caused him concern, as the obvious implication of Mother's statement was that she might soon begin to have problems with A.C., who was already two years old. He observed that A.C. did have a relationship with Mother and seemed to trust her, but also that A.C. had a relationship with and was attached to her foster parents. (Id. at 14). He opined that A.C. would most likely not have any negative reaction to termination of visitation with Mother. (Id. at 14, 15).
¶ 25 The only witness to testify that he had no concerns with regard to Mother's parenting ability was her counselor, Hayes Kline. (N.T., 2/8/06, at 25). However, Mr. Kline had no knowledge of Mother's interactions with N.C., and indeed had never spoken with N.C. (Id. at 27).
¶ 26 On this extensive record, we must conclude that there is ample evidence to support the trial court's factual finding that Mother's parenting ability remained problematic, even though she had substantially completed her permanency plan. The trial court engaged in a very thorough and deliberate fact-finding process, conducting several hearings with numerous witnesses, before reaching all of its final conclusions. The court also had the benefit of input from the children's guardian ad litem, who supported the change of goal to adoption. The guardian ad litem opined that adoption would provide needed permanency to N.C. and allow him to deal with his past negative experiences. (N.T., 2/8/06, at 129).
¶ 27 In addition, the court properly considered the preference of N.C., who at the time of the hearings was 13 years old. He wrote a letter to Mother, which was admitted into evidence, in which he strongly stated that he wanted to be adopted by his foster parents.[10] His letter also explicitly stated that he did not wish to return to Mother's care because he was scared to do so, because Mother lied to him, and because Mother had too many "boys" in her life. (See Trial Court Opinion, dated April 17, 2006, at 5).
¶ 28 Mother acknowledges neither the significance of the length of time that her children have been in placement, nor the damage caused to her children, particularly to N.C., by her conduct. (See, e.g., id. at 6 (noting that N.C. as the oldest of the children "has suffered the most at [Mother's] hands" and has "very deep and painful emotional scars")). In February 2006, when the court changed N.C.'s placement goal to adoption, N.C. was nearly 14 years old and had been in placement for two and one-half years. In November 2005, when the court changed A.C.'s goal to adoption, she had been in foster care, with the "only true parents" she had ever known, for all but the first 5 months of her 22 months of life. (Trial Court Opinion, dated February 1, 2006, at 6). The trial court determined that these children need permanency and stability in a loving home, which their Mother has not given them and still cannot give them. Therefore, consistent with the Juvenile Act and the ASFA, the trial court focused on the best interests of the children and granted the goal change to *827 adoption, even though Mother had made substantial progress in completing her permanency plan. See G.P.-R., supra at 973 ("[I]n a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents.") As ample evidence of record supports the trial court's findings, we determine that the court did not abuse its discretion in ordering the change of goal to adoption.
¶ 29 In Mother's next issue, she contends that CYS did not make reasonable efforts to reunify her family. (Mother's Brief at 40). Specifically, Mother argues that CYS did "little to facilitate the return of the children" to her, but instead "purposely attempted to thwart the children's return . . . [by] misstat[ing] or omit[ing] facts to make Mother look worse." (Mother's Brief at 40, 41). These allegations have absolutely no basis and no merit.
¶ 30 The trial judge, who has conducted the dependency hearings for this family for years, concluded the following with regard to Mother's attitude: "[W]e've been together [in these dependency hearings for] a couple of years now. There have been some bureaucratic snafus, but everything is always somebody else's fault. . . ." (N.T., 2/8/06, at 131).
¶ 31 The record reveals that Mother and her children have received a myriad of services during the years that her children have been dependent. Mother has been the beneficiary of a parenting program, as well as individual counseling and family counseling. She has received psychiatric testing and drug and alcohol monitoring. N.C. has participated in individual and family counseling. Mother had started a reunification program, which was of necessity interrupted when she was arrested on a charge of driving while under the influence and incarcerated.
¶ 32 There is ample evidence of record that CYS provided Mother and her children with reasonable services over a period of several years. Mother's contention to the contrary is unsupported by any evidence and therefore has no merit.
¶ 33 In Mother's final issue, she contends that it was improper for the court to end visitation between her and the children. (Mother's Brief at 47-48). She advances a single argument in support of this issue: that the placement goal changes to adoption were unjustified, and therefore discontinuing visitation must also be unjustified. (Id.) As we have already made clear, the trial court did not abuse its discretion in changing N.C.'s and A.C.'s placement goals to adoption. Therefore, Mother's argument regarding visitation must fail.[11]
¶ 34 In sum, after careful review of the extensive record, we conclude that the trial court did not abuse its discretion in changing the placement goals for N.C. and A.C. *828 to adoption.[12] Accordingly, we affirm the order of the trial court.
¶ 35 Order affirmed.
NOTES
[1] We have amended the caption to include N.C. since the order of February 8, 2006 addressed both L.C. and N.C.
[*] Retired Senior Judge Assigned to the Superior Court.
[2] All the fathers have served time in prison, and most have been involved only sporadically, if at all, in their children's lives. N.C.'s father is a registered sex offender living out of state. While he appeared at some of the early hearings regarding N.C., he is not presently involved. A.C.'s father has not been a factor in her life. S.C. and M.C. have the same father, I.C., who was granted custody of the two girls on November 5, 2005. L.C., who has the same father as A.C., was ordered to remain in the custody of her paternal grandmother.
[3] CYS had first sought a goal change from reunification for N.C. and A.C. in July 2005, at which time it was denied.
[4] Mother's counseled brief does not follow the requirements of Pennsylvania Rule of Appellate Procedure 2116, "Statement of Questions Involved," which requires a brief, general statement of questions raised, without particulars, never to exceed one page. Mother's statement extends to three and one-half pages, delineates twelve issues, and incorporates entirely inappropriate detail and mere repetition of the same points applied to each child. The inappropriate format of Mother's brief is emphasized by the fact that her statement of questions is more than twice as long as her summary of argument (three and one-half pages vs. one and one-half pages). In contrast to the twelve issues presented in Mother's statement of questions, her argument section contains only four parts and a few sub-parts, which do not directly correspond to the issues in the statement of questions. See Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued.") Some of the issues raised in the statement of questions are not even mentioned, much less argued, in the argument section of the brief. Issues not argued are waived. Shepp v. Shepp, 821 A.2d 635, 639 (Pa.Super.2003).

We will not consider Mother's statement of questions involved because it totally lacks compliance with Rule 2116 and raises several issues not subsequently argued. We have, however, addressed the issues which Mother argues in her brief, taking our statement of her questions raised from the headings therein. See Savoy v. Savoy, 433 Pa.Super. 549, 641 A.2d 596, 598 (1994) ("Since [appellant's] failure to comply with [Rules of Appellate Procedure 2111 and 2116] does not impede our ability to review the issues, we will address the merits of this appeal.") We remind counsel that her failure to follow the rules constitutes a disservice both to this Court as well as to her client.
We also note that Mother claims to be appealing the court order changing the placement goal from reunification not only for N.C. and A.C., but also for L.C.; however, the last court order regarding L.C. specified clearly that her placement goal was reunification. (See Mother's Brief at 13; Court Order, dated 2/8/06, at 1). Thus, this part of Mother's appeal is moot.
[5] Mother's brief cites "N.C. and L.C." in this heading. We assume that Mother is really referring to A.C., not L.C., since the court did not end visitation between Mother and L.C.
[6] 42 Pa.C.S.A. §§ 6301-65.
[7] 42 U.S.C. § 671 et seq.
[8] The primary cases cited by Mother were from the 1980s, and thus they predate the 1998 amendments to the Juvenile Act mandated by ASFA. Specifically, Mother cites In re Damon B., 314 Pa.Super. 391, 460 A.2d 1196 (1983); In re Damon B., 338 Pa.Super. 597, 488 A.2d 53 (1985); In re Desiree B., 304 Pa.Super. 461, 450 A.2d 1003 (1982).
[9] Mother rhetorically questions how the trial court could change the goal for L.C. back to reunification with Mother, while at the same time changing the goal for N.C. and A.C. to adoption. Mother's posing of this question further illustrates her failure to understand that the focus of dependency proceedings is on the childnot on the conduct of the parent. The court here fulfilled its responsibility to determine the best interests of each of Mother's children on an individual basis. There is no inherent internal conflict in a determination that the best resolution for one child may not be the same as that for another child.
[10] N.C. and A.C. are in the same foster home, and their foster parents have expressed interest in adopting both children. (N.T., 11/9/05 at 34, 39). The CYS caseworker testified that N.C. was doing well in school and had adjusted well to his foster home and to his foster siblings. (Id. at 36). A.C. was doing exceptionally well in the same foster home. (Id. at 37).
[11] We must note that, contrary to some of the statements in Mother's brief, the standard the court uses to determine whether it will grant visitation is dependent upon the placement goal mandated in the permanency plan. (See Mother's Brief at 48). When reunification is the placement goal, then visitation will not be denied or reduced unless the visitation poses a grave threat to the child. In re C.B., 861 A.2d 287, 293 (Pa.Super.2004), appeal denied, 582 Pa. 692, 871 A.2d 187 (2005). However, when reunification is no longer the placement goal, then visitation may be limited or even denied if to do so would be in the best interests of the child. Id. "The `best interests' standard, in this context, is less protective of parents' visitation rights than the `grave threat' standard." In re B.G., 774 A.2d 757, 760 (Pa.Super.2001) (citation omitted).
[12] We are compelled to comment on Mother's undeveloped allegation in the conclusion section of her brief that "[w]hat has happened in this case is a prime example of social engineering perpetrated by CYS among others to deprive Mother of her rights to her children [as] was the case in In the Matter of C.R.S., 696 A.2d 840 (Pa.Super.1997)." (Mother's Brief at 50). This allegation, which Mother levels but fails to develop or explain, is factually and legally incomprehensible, as well as irresponsible. Firstly, Mother cites no evidenceand our exhaustive review of the record reveals no evidencethat remotely lends even the slightest factual support to such an allegation. Secondly, C.R.S. provides no legal support. In C.R.S., this Court reversed the trial court's finding of abuse and dependency of a very young child, concluding that there was no clear and convincing evidence of abuse or non-accidental injury. C.R.S., supra at 845. C.R.S. did not in any way invoke or imply the concept of "social engineering." We remind Mother's counsel that advocacy, no matter how impassioned, must be built on a foundation of reason. Inflammatory allegations with no basis in fact or law do not advance a party's cause.