J-S16002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.S.C.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 260 EDA 2021 |

Appeal from the Decree Entered January 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000447-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: T.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 261 EDA 2021 |

Appeal from the Decree Entered January 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000216-2019

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 09, 2021**

T.L. ("Mother") appeals from the decrees entered on January 7, 2021, which granted the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate her parental rights to minor daughter, T.S.C.L. a/k/a T.L. ("Child") (born in January of 2019), pursuant to

---

[*] Former Justice specially assigned to the Superior Court.

sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and to change the permanency goal for Child from reunification with Mother to adoption.[1]  After careful review, we affirm.

We glean the following facts and procedural history from the record.  On January 24, 2019, DHS received a report stating that Mother gave birth to Child at the Hospital of the University of Pennsylvania ("HUP"); that Mother and Child tested positive for phencyclidine ("PCP"); that Child was born at 37.2 weeks gestation and weighed under five pounds; and that Child had been admitted to the Intensive Care Unit ("ICU") and was being monitored for withdrawal symptoms.  The report further indicated that Mother admitted to smoking PCP during her pregnancy, and that she had a history of incarceration.  Child's older siblings were not in Mother's care, and it was unknown if the alleged father[2] would be involved in Child's care.

DHS visited Mother and Child at HUP.  When DHS spoke with Mother, she admitted to using PCP a few days prior to giving birth to Child after a verbal altercation with Child's alleged father.  DHS learned from HUP that Mother spoke openly about her PCP use, and that she claimed that her drug

---

[1] By *per curiam* order entered on February 17, 2021, this Court consolidated the appeals at Nos. 260 and 261 EDA 2021, *sua sponte*, as the appeals involve related parties and issues.

[2] On March 21, 2019, a paternity test confirmed that the alleged father was not the biological father of Child.  Another alleged father ("Putative Father") was identified on May 9, 2019, and paternity was confirmed on or around March 11, 2020.  The trial court terminated Putative Father's parental rights on January 7, 2021.  Putative Father is not involved in this appeal.

use was not problematic. Hospital staff found Mother's behavior to be odd. DHS learned that Mother had previously been diagnosed with bipolar disorder and post-traumatic stress disorder ("PTSD"), and that she was receiving therapy at Community Council. She was prescribed Seroquel and Tramadol for her mental health diagnoses. She was scheduled to be discharged from HUP on January 26, 2019, while Child's discharge date remained unknown.

On January 29, 2019, DHS spoke with a family friend ("Resource Parent") who stated that she was willing to care for Child upon her discharge from HUP. Mother and Resource Parent agreed that Child would be discharged to Resource Parent's care with a safety plan in place. On January 30, 2019, DHS received a phone call from a social worker from the HUP ICU. The social worker stated that HUP staff met with Mother on January 29, 2019, but that when Mother arrived, she indicated that she did not feel well. HUP staff sent her for an evaluation, where Mother admitted that she had used PCP before attending the meeting; thus, Mother would be recommended for the Mothers Matter substance abuse treatment program. Her intake meeting was scheduled for January 31, 2019. HUP staff was to notify DHS if Mother successfully completed the program. On February 4, 2019, Child was discharged from HUP into Resource Parent's care.

On February 19, 2019, DHS filed an urgent dependency petition for Child. After several deferments, on May 23, 2019, the trial court adjudicated Child dependent, ordered Child to be placed in kinship care with the Resource Parent, and referred Mother to the Clinical Evaluation Unit ("CEU") for drug

screens and assessment. Additionally, Mother was granted supervised visits with Child and was referred to the Achieving Reunification Center ("ARC") for parenting services. Her Single Case Plan ("SCP") goals were to comply with the Community Umbrella Agency ("CUA") Turning Points for Children ("TPC") and ARC services, to continue to attend Community Council for mental health treatment, and to attend substance abuse treatment at NorthEast Treatment Centers ("NET").

Regular permanency review hearings were held. At each one, the trial court found Child's placement continued to be necessary and appropriate and directed DHS to make reasonable efforts to finalize Child's permanency plan. At a permanency hearing on July 31, 2019, the trial court referred Mother to the CEU for a dual diagnosis (substance use and mental health) assessment and for random drug screens. The trial court found that aggravated circumstances existed as to Mother, pursuant to 42 Pa.C.S. § 6302, due to a prior involuntary termination; however, it ordered that DHS continue reasonable efforts to preserve the family and reunify Mother and Child. Supervised visitations were to continue.

On September 11, 2019, the SCP was revised. Mother participated in this meeting via telephone. Child's primary goal was identified as adoption with a concurrent goal of reunification. Mother's objectives remained the same. On October 17, 2019, DHS received a progress report from the CEU, which indicated that Mother had tested positive for PCP on July 31, 2019, September 25, 2019, and October 3, 2019. Mother had informed the CEU on

July 31, 2019, that she was engaged in substance abuse treatment through NET. As such, the CEU did not schedule an assessment but advised Mother to sign releases so that it could monitor her treatment. On September 25, 2019, Mother informed the CEU that she was no longer enrolled in substance abuse treatment through NET. Accordingly, the CEU scheduled an assessment for Mother for October 8, 2019, but she was a no-show and failed to reschedule.

Moreover, at the October 17, 2019 permanency review hearing, the trial court took notice that Mother had completed anger management and parenting services, and that she resided at a shelter. Mother reported that she was engaged in mental health treatment through Community Council and that she had successfully completed 30 days of inpatient substance abuse treatment through the Kirkbride Center. The trial court ordered Child remain as committed to DHS; referred Mother to the CEU for a dual diagnosis assessment, monitoring, and random drug screens; directed Mother to comply with the CEU's recommendations; and ordered both Gaudenzia and Community Council to provide the court with copies of Mother's treatment plan and progress notes.

On February 18, 2020, DHS received another progress report from the CEU, indicating that Mother had again tested positive for PCP on January 13, 2020. Because Mother did not provide the CEU with consent to monitor her treatment, it was unable to report on her treatment progress. At the permanency hearing held on that same date, the trial court decreased

Mother's visitations to one-hour supervised visits to occur once every two weeks, and directed that Mother's visits were to be cancelled in the event she appeared to be under the influence of substances. Mother was again referred to the CEU for drug screens and ordered to attend a substance abuse assessment and to engage in any recommended treatment.

On August 13, 2020, the trial court found Mother to be "moderately compliant" with the permanency plan, in that she had completed a parenting and anger management course and reported to be engaged in mental health treatment through Community Council, but that she had made "no progress" towards reunification, as she had failed to alleviate the circumstances that necessitated Child's placement. **See** Trial Court Opinion ("TCO"), 3/4/21, at 4-5. The court referred Mother to the Behavioral Health System ("BHS") for monitoring, and to the CEU for drug and alcohol screens. It further ordered Community Council to provide a full progress report and treatment plan as to Mother, and directed DHS to explore Voluntary Relinquishments of Parental Rights ("VOLS") as to Mother.

Given that Child had been adjudicated dependent since May 29, 2019, and that Mother continued to fail to consistently engage with her SCP objectives and to comply with court orders, on December 4, 2019, DHS filed petitions to involuntarily terminate Mother's parental rights and to change the permanency goal to adoption. A hearing was conducted on these matters on January 7, 2021. Mother was present at the hearing and testified on her own behalf. DHS presented the testimony of CUA's Shante Brown Atkins, who

began working with the family in December of 2019 and maintained regular contact with Mother. At the conclusion of the hearing, the trial court found clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and to change Child's goal from reunification to adoption.

On January 28, 2021, Mother timely filed notices of appeal. Herein, she presents the following issues for our review:

1. Did the trial court err in ruling that DHS met its burden of proving that Mother's parental rights to Child should be terminated?

2. Did the trial court err in ruling that the termination of Mother's parental rights would best serve the needs and welfare of Child?

3. Did the trial court err in finding that DHS met its burden of proving that Child's permanency goal should be changed to adoption?

4. Did the trial court err in finding that it was in Child's best interest to change the permanency goal to adoption?

*See* Mother's Brief at 4 (cleaned up).

We review a decree terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to

determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(1) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(1).

> To satisfy [s]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). In *C.M.S.*, we further acknowledged the following statement by our Supreme Court:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child

- 10 -

needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

Mother claims that the trial court erred in terminating her parental rights under section 2511(a)(1). Mother avers that, contrary to the court's finding, she "was not relinquishing a claim to … [C]hild because she was engaged in her [SCP] goals…." Mother's Brief at 8. She maintains that at the time of the termination hearing, she had completed the ARC parenting and anger management classes and was attending mental health programs at Community Council. *Id.* Regarding drug treatment, Mother avers that she completed an inpatient drug program in the past and that she was enrolled in a drug program at the time of the hearing. *Id.* at 9. Additionally, Mother claims that she fulfilled her parenting duties by visiting Child and asserts that she was trying to better herself economically for both herself and Child, *e.g.*, she was taking online college classes for forensic studies. *Id.* at 10-11.

Mother has failed to convince us that she is entitled to any relief on this claim. In support of its decision to terminate Mother's parental rights under section 2511(a)(1), the trial court opined:

The petition for involuntary termination was filed on December 4, 2020. For the six months prior to the filing of the petition, Mother's SCP objectives were to comply with CUA and trial court orders; housing; employment; education; drug and alcohol; mental health; and visitation. Mother was regularly in contact with CUA and she was aware of her objectives. [Her] objectives in 2019 included parenting and anger management. Mother has completed programs for both parenting and anger management. [She] was referred to ARC for housing. [She] was discharged from ARC on August 24, 2020, for noncompliance. Mother informed CUA that she obtained housing in Upper Darby, Pennsylvania[,] in October 2020 and showed CUA a copy of a utility bill as proof. [She] did not provide CUA with a lease in her name, although [she] informed CUA that she had a lease for the home in her name and her husband's name. CUA was unable to verify if Mother's name was on the lease as claimed. Mother needs to provide an appropriate lease to satisfy her housing objective. Mother was not employed. [She] receives social security disability insurance ("SSDI") for a mental health disability. Mother has enrolled in online post[-]secondary education courses for forensic studies. [She] provided proof of enrollment in October 2020 for the fall semester[; however,] Mother has not verified that she was enrolled for the upcoming spring semester.

Mother has failed to successfully complete a substance abuse program, although [she] has attended numerous programs. Mother has previously been enrolled in drug and alcohol programs with NET, Gaudenzia, and Belmont, but did not complete any of these programs successfully. Mother had enrolled in an inpatient drug and alcohol program but was discharged from the program after she was caught with PCP. [She] most recently enrolled in a drug and alcohol program at Mirmont Treatment Center on December 18, 2020, after the filing of the petitions. Mother claimed that she attends her current program virtually three times per week[,] and this program is supposed [to] come to her to complete drug screens. At the time of the termination and goal change trial, Mother had not completed a drug screen with

Mirmont. When [she] completed drug screens at the CEU, Mother tested positive for PCP on multiple occasions between July 2019 and February 2020. The CEU had attempted to confirm [her] enrollment in a treatment program on multiple occasions, but [she] failed to provide the CEU with the appropriate consent signatures. There are ongoing concerns regarding Mother's substance use, which poses a safety threat and a barrier to reunification with Child. Mother admitted that she is still working on maintaining her sobriety and last got high a "couple months" prior.

Mother claimed that she was receiving mental health treatment consistently through Community Council, but CUA has not received any documentation verifying her enrollment or her progress. Mother claimed that she receives therapy and medication management for bipolar disorder, PTSD, and postpartum depression. [She] also claims that she takes her prescribed medication … consistently. CUA's inability to verify Mother's mental health also remains an ongoing safety concern and barrier for reunification with Child. CUA indicated that based on interactions with Mother, [she] still needs to engage with mental health services. The CUA case manager stated that Mother has reached out on multiple occasions for emotional support. The CUA case manager has reminded Mother on multiple occasions that she needs to seek support from her therapist.

Mother's visits with Child occur biweekly and are supervised at the agency. Prior to March 2020, the visits were in person but were switched to virtual visits due to the ongoing pandemic. Mother's visits with Child are appropriate. [Her] failure to progress with her drug and alcohol objective has prevented Mother from graduating beyond supervised visitation with Child. Mother has been moderately compliant with her objectives. Throughout the life of the case, [she] has struggled with consistently engaging with her objectives. [She] attends some of her programs but does not continue to follow through in order to successfully complete the designated program objectives. Mother has made minimal progress towards resolving the safety and dependency concerns that brought Child into care. On July 13, 2019, the trial court found aggravated circumstances as to Mother. Mother's parental rights were previously involuntarily terminated as to Child's older siblings. Child needs permanency, which Mother has refused to provide by failing to consistently engage in her SCP objectives. Mother has not taken all of the positive steps necessary to put

herself in a position to be reunified with Child, which [she] has the affirmative duty to do…. For the entire six-month period prior to the filing of the petition, Mother either failed or refused to successfully complete her SCP objectives and place herself in a position to parent. At the time of the termination trial, Child could not be safely reunified with Mother. As a result, the trial court did not err or abuse its discretion by finding clear and convincing evidence that Mother, by her conduct, had refused and failed to perform parental duties and has evidenced a settled purpose to relinquish her parental claim to Child, so termination under 23 Pa.C.S.[] § 2511(a)(1) was proper.

TCO at 6-9 (citations to record and footnotes omitted; paragraph breaks added). After careful review, we conclude that the trial court's determinations are well-supported by the record, and we discern no abuse of discretion.

As for the analysis under section 2511(b), Mother claims the trial court erred in finding it was in Child's best interest to terminate her parental rights. Mother's Brief at 22-23. Mother fails, however, to develop her argument. Aside from reciting some caselaw regarding the court's duty to consider the effect of terminating parental rights where an emotional bond exists between a parent and child, Mother merely states that she "was visiting … [C]hild" and "acting appropriately with … [C]hild." *Id.* at 23. She fails to argue that she has an emotional bond with Child and fails to state how the termination of her parental rights would negatively impact Child. Thus, we deem Mother's claim regarding the trial court's findings under section 2511(b) to be waived. *See* Pa.R.A.P. 2119(b); *Estate of Haiko v. McGinely*, 799 A.2d 155, 161 (Pa. Super. 2002) ("Without a reasoned discussion of the law … our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for [Appellants].").

Nevertheless, even if Mother had not waived this issue, we would conclude that her claim is meritless. While the trial court agreed that Mother's visits with Child were "appropriate," this simply was not enough to establish that an emotional bond existed between Mother and Child or that terminating Mother's parental rights would be harmful to Child. In support of its decision to terminate Mother's parental rights under section 2511(b), the trial court opined:

> At the time of the termination trial, Mother's visits with Child occurred biweekly and were supervised at the agency. Prior to March 2020, the visits were in person but were switched to virtual visits due to the ongoing pandemic. Mother's visits with Child are appropriate, although Mother has not been able to develop a bond with Child. Mother's failure to progress with her drug and alcohol objective has prevented [her] from graduating beyond supervised visitation with Child and remains a barrier to reunification due to safety concerns. Child is placed in a pre-adoptive kinship home with Resource Parent. Child was placed in Resource Parent's home when she was less than one month old and has remained in this placement for the life of the case. Child shares a parent-child bond with Resource Parent. Child has previously received early intervention services, but Resource Parent ensured that Child completed those services. Child is now developmentally on target. Resource Parent has ensured Child's medical and dental needs are met. CUA has observed Child in Resource Parent's home and Child has shown a strong bond with Resource Parent. When Child would attend visits with Mother, Child would cry when Resource Parent leaves [*sic*] and would try to run after her. It would be harmful if Child were to be removed from her current placement with Resource Parent. Child does not share a parent-child bond with Mother. Child would not suffer any irreparable harm if Mother's parental rights were terminated. At the time of the termination trial, Child could not be safely reunified with Mother. On July 13, 2019, the trial court found aggravated circumstances as to Mother. Mother's parental rights were previously involuntarily terminated as to Child's older siblings. The record establishes by clear and convincing evidence that termination would not sever an

- 15 -

existing and beneficial relationship between Mother and Child. The DHS witness was credible.

TCO at 18-19 (citations to record omitted).

Likewise, DHS observed that Child did not share a beneficial, parent-child bond with Mother. DHS's Brief at 29. It noted that Mother only saw Child every other week, during supervised visits. Despite Mother's efforts to engage with Child during those visits, Ms. Atkins did not believe that Child was bonded with Mother. *Id.* She testified that Child often cried and reached out for the Resource Parent at visits. Thus, Ms. Atkins concluded that Child would not suffer harm if Mother's parental rights were terminated. "She doesn't really know [Mother] in that capacity for her to feel any type of way." *Id.* at 29-30 (quoting N.T. Hearing, 1/7/21, at 41). In contrast to Child's superficial relationship with Mother, DHS observed that Child shares a significant, parent-child bond with her Resource Parent, with whom she has lived since she left the hospital after birth. *Id.* at 30. Ms. Atkins stated that Child looks at the Resource Parent as her parent and shared that she believed it would be harmful to Child to be removed from the kinship home, as Child is thriving in the Resource Parent's care. *Id.*

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Mother, we would conclude that the court did not abuse its discretion in terminating Mother's parental rights under section 2511(b). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (stating that appellate courts must defer to the trial court regarding

credibility determinations and weight assessments, so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion).

Having determined that the trial court did not err in terminating Mother's parental rights, we proceed with addressing Mother's issues regarding the permanency goal change. In reviewing these claims, we are guided by the following:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.*, 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re A.K.*, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. *Id.*

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Furthermore, this Court has stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act[, 42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of

the child must take precedence over *all* other considerations, including the rights of the parents.

*In re N.C.*, 909 A.2d at 823 (citations and footnotes omitted; emphasis in original). Additionally, we recognize that "the agency has the burden to show a goal change would serve the child's best interest…." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010).

Specifically, section 6351 of the Juvenile Act provides direction to the court for the disposition of dependent children, stating in pertinent part:

**§ 6351. Disposition of dependent child**

…

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

…

(9)　If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)　the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii)　the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii)　the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\*\*\*

**(f.1) Additional determination.** — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)　If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)　If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\*\*\*

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f), (f.1), (f.2), (g).

Moreover, this Court has provided further considerations that apply in goal change situations, stating:

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C.*, *supra* [at] 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply

- 20 -

the instruction provided. ***In re A.L.D.***, 797 A.2d 326, 340 (Pa. Super. 2002). ***See also In re S.B.***, ***supra*** at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); ***In re A.P.***, 728 A.2d 375, 379 (Pa. Super. 1999), *appeal denied*, … 743 A.2d 912 ([Pa.] 1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

***In re R.M.G.***, 997 A.2d at 347.

Here, Mother argues that the trial court erred in ruling Child's permanency goal should be changed to adoption. Mother's Brief at 24. In support of her claim, Mother merely reiterates her arguments that she had been meeting her SCP goals, that she attended "appropriate" visits with Child, and that she was taking online classes in an effort to better herself economically. ***Id.*** at 24-27. Additionally, Mother claims that the trial court erred in determining that it was in Child's best interest to change the permanency goal to adoption. ***Id.*** at 27. Once again, Mother fails to establish that an emotional bond exists between her and Child and simply states that it would not be in Child's best interest to change the goal to adoption, because "Mother was visiting with … [C]hild and acting appropriately with … [C]hild." ***Id.*** at 28.

We emphasize that, in determining whether a goal change is appropriate, the focus is on the child's best interests. ***See In re N.C.***, 909 A.2d at 823 (noting that "[s]afety, permanency, and well-being of the child

- 21 -

must take precedence over *all* other considerations, including the rights of the parents") (emphasis in original). As so aptly stated by DHS, in the instant matter,

> Child had languished in care for 19 months, nearly her whole life, clearly meeting ASFA timelines. Furthermore, the trial court found at every permanency review hearing that DHS made reasonable efforts to finalize Child's permanency goal of reunification. Despite these continual reasonable efforts by DHS and CUA, as well as services provided by CEU, ARC, NET-West, Gaudenzia, Belmont, Goldman Center, Kirkbride Center, and Maribaum, reunification had not occurred due to Mother's lack of progress.
>
> The trial court properly relied on Ms. Atkin's credible testimony that it would be in Child's best interest to change her permanency goal to adoption because Child could not be safely reunified with Mother. It follows that adoption would be her next best permanency option.
>
> By the [termination/goal change] hearing, Mother had not put herself in a position, and did not seem likely to put herself in a position, to parent Child on a full-time basis. There was no indication that anything would change. Mother had been given enough time.

DHS's Brief at 32-33 (citations to record omitted).

Moreover, our review of the record reveals that the trial court thoroughly addressed the appropriate matters as set forth in section 6351(f) of the Juvenile Act. Specifically, the court found that Mother has not been able to develop a bond with Child, that she has been only "moderately compliant" with her SCP objections, and that she has made "minimal progress" towards resolving the safety and dependency concerns that brought Child into care. *See* TCO at 21 (citations to record omitted). The trial court further found that Child does share a parent-child bond with Resource Parent, and that Child is

thriving under Resource Parent's care. *Id.* At the time of the goal change hearing, the court deemed Child could not safely be reunified with Mother and that it was in Child's best interest to be freed for adoption. *Id.* at 22.

We determine that there is competent evidence in the record to support the trial court's conclusion that, despite her attempts, Mother made insufficient progress toward alleviating the circumstances which necessitated Child's original placement. Accordingly, we agree with the lower court's determination that Child's best interests are served by changing her permanency placement goal from reunification to adoption, and we discern no abuse of discretion on the part of the trial court in so ordering.

Based on the foregoing, we affirm the January 7, 2021 decrees involuntarily terminating Mother's parental rights and changing the permanency goal to adoption.

Decrees affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/9/2021*

- 23 -